**GREENSBORO LUMBER COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Oglethorpe Power Corporation, Intervenor.**

**No. 86-1366.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1987.

Decided Aug. 11, 1987.

Mark L. Gerchick, Washington, D.C., with whom Beth Emery and Bruce D. Ryan were on the brief, for intervenor.

Jack H. Watson, Jr., Washington, D.C., with whom Stephen Milliken was on the brief, for petitioner.

Joshua Rokach, Atty., F.E.R.C. ("FERC"), Washington, D.C., for respondent. Barbara J. Weller, Deputy Solicitor, and Joanne Leveque, Atty., FERC, were on the brief, for respondent.

Before RUTH BADER GINSBURG and BUCKLEY, Circuit Judges, and THOMAS E. FAIRCHILD,* U.S. Senior Circuit Judge for the Seventh Circuit.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

In 1980 the Federal Energy Regulatory Commission promulgated regulations designed to encourage the generation of electricity from resources produced during manufacture, a technique called "cogeneration." The regulations require electric utilities to purchase excess electricity from, and sell back-up electricity to, owners of cogeneration facilities. In this case the owner of a cogeneration facility, Greensboro Lumber Company, challenges Commission decisions to waive the purchase and sale requirements of an electric cooperative, Oglethorpe Power Corporation, and its member utilities. Greensboro contends that the Public Utility Regulatory Policies

Act of 1978, 16 U.S.C. §§ 796, 824, 2602 (1982) ("PURPA"), clearly prohibits these waivers, or, in the alternative, that the waivers are inconsistent with the Commission's prior interpretations of the statute.

We conclude that the applicable statutory language is unclear, that the Commission's construction is reasonable, and that the Commission did not arbitrarily abandon its earlier interpretations. We therefore uphold the waivers as based on reasonable agency interpretations of ambiguous statutory language.

## I. BACKGROUND

In 1978 Congress determined that cogeneration is in the national interest, but found electric utilities reluctant to provide cogenerators a market for their electric production. It also found that utilities often declined to provide cogenerators with back-up power on a supplementary, maintenance, and interruptible basis. Accordingly Congress provided, in section 210 of PURPA, that:

> Not later than 1 year after November 9, 1978, the Commission shall prescribe, and from time to time thereafter revise, *such rules as it determines necessary* to encourage cogeneration and small power production ... *which rules require electric utilities* to offer to—
>
> > (1) sell electric energy to qualifying cogeneration facilities and qualifying small power production facilities and
> >
> > (2) purchase electric energy from such facilities.

16 U.S.C. § 824a–3(a) (1982) (emphasis added).

The Commission complied with the mandate of section 210 by prescribing a series of regulations. One of them, 18 C.F.R. § 292.303 (1986), is at the center of this controversy. That regulation states in pertinent part:

> (a) *Obligation to purchase from qualifying facilities.* *Each* electric utility shall purchase, in accordance with § 292.-304, any energy and capacity which is made available from a qualifying facility:

(1) Directly to the electric utility; or

(2) Indirectly to the electric utility in accordance with paragraph (d) of this section.

(b) *Obligation to sell to qualifying facilities. Each* electric utility shall sell to any qualifying facility, in accordance with § 292.305, any energy and capacity requested by the qualifying facility.

*Id.* (emphasis added). Because both subsections of section 292.303 refer to "[e]ach utility," it is clear that this provision, on its face, allows no exceptions. That section, however, does not stand alone. At the same time the Commission prescribed section 292.303, it also prescribed the following waiver provision:

(a) *State regulatory authority and nonregulated electric utility waivers.* Any ... nonregulated electric utility may, after public notice in the area served by the electric utility, apply for a waiver from the application of any of the requirements of Subpart C [including § 292.303] (other than § 292.302 thereof).

(b) *Commission action.* The Commission will grant such a waiver only if an application under paragraph (a) of this section demonstrates that compliance with any of the requirements of Subpart C is not necessary to encourage cogeneration and small power production and is not otherwise required under 210 of [PURPA].

18 C.F.R. § 292.403 (1986) ("the waiver provision").

In 1974 thirty-nine Georgia retail distributors of electricity, called "electric membership corporations" or "EMCs," formed an electric generation and transmission cooperative, Oglethorpe Power Corporation ("Oglethorpe"), to supply the membership with electricity at wholesale rates for subsequent retail sale to their customers. In 1981 Oglethorpe asked, on behalf of itself and the EMCs, that the Commission waive the requirements of section 292.303. It made that request because the corporate purposes of Oglethorpe and the EMCs clash with the requirements of section 292.-303. As Oglethorpe was created to sell electricity only at wholesale, selling it to any cogenerator would involve an undesired retail operation. Similarly, because the EMCs created Oglethorpe to obtain electricity on their behalf, they are reluctant to purchase electricity directly from other sources. Therefore the EMCs requested waiver of the purchase obligation in section 292.303(a), and Oglethorpe requested waiver of the sale obligation in section 292.303(b).

As made clear in its filing, Oglethorpe did not request a waiver of the purchase obligation, and the EMCs did not request a waiver of the sale obligation. Rather, Oglethorpe assured the Commission that it remains ready to purchase electricity from cogenerators like Greensboro. Likewise, the EMCs have assured the Commission of their readiness to sell electricity to cogenerators. Thus Oglethorpe and the EMCs requested waivers only to the extent that would allow them, as members of a group, to allocate the obligation to buy and sell in a manner consistent with their corporate purpose.

In keeping with that position, the EMCs and Oglethorpe specifically agreed to implement an "Interconnection Policy," under which "Oglethorpe would make all purchases from [qualifying facilities] and the EMCs make all sales of power to [qualifying facilities]." *Oglethorpe Power Corp., et al.,* 32 F.E.R.C. 61,282 (1985) ("*Oglethorpe I*"). Because of the readiness of Oglethorpe and the EMCs to comply, respectively, with the purchase and sale regulations, the Commission determined that the requested waivers properly could be granted under the waiver provision.

Moreover, the Commission carefully conditioned its waiver of the purchase obligation as it applies to the EMCs, and of the sale obligation as it applies to Oglethorpe, on their adherence to the Interconnection Policy and other conditions. The Commission waived Oglethorpe's duties under the sale regulation

with respect only to qualifying facilities that will receive back-up services from an EMC consistent with this order, and subject to the condition that no qualifying facility shall be subject to duplicative

interconnection charges or charges for wheeling of back-up power from an EMC, and shall not be required to build separate facilities to the local EMC to receive back-up services....

*Oglethorpe Power Corp., et al.,* 35 F.E. R.C. 61,138 (1986) (Joint Appendix ("J.A.") at 221) (*"Oglethorpe II"*). Similarly, it waived the EMCs' duties under the purchase regulation

subject to the conditions that Oglethorpe continue to be ready and willing to purchase power from qualifying facilities from which the EMCs would otherwise be required to purchase, and that no qualifying facility shall be subject to duplicate interconnection charges or charges for wheeling power to Oglethorpe across EMC transmission lines.

*Oglethorpe I* at 61,287 (J.A. at 216).

Greensboro is dissatisfied with that outcome because, as its counsel explained in oral argument, Greensboro would profit more from selling electricity directly to the EMCs and buying back-up power from Oglethorpe, than from selling electricity to Oglethorpe and buying back-up power from the EMCs. Thus Greensboro intervened before the Commission in opposition to the waiver petition. Greensboro argued that waiver of the section 292.303(a) purchase obligation as to the EMCs would be *"ultra vires"* because PURPA requires that it be applied without exception. It argued in similar fashion that waiver of the section 292.303(b) sale obligation as to Oglethorpe would be "improper" because this regulation is necessary to encourage cogeneration. Motion of Greensboro to Intervene and Protest (J.A. at 23). It also asserts that the Commission originally interpreted section 210 as not permitting any waiver of the purchase and sale obligations. Brief for Petitioner Greensboro at 16.

Greensboro filed this petition for review after the Commission, in two separate decisions, approved the waiver request subject to the conditions mentioned above. Oglethorpe and the EMCs intervene in support of the Commission.

## II. DISCUSSION

### A. Whether the Meaning of PURPA Is Clear

The key issue in this case is whether the Commission's orders are authorized by statute. We must first determine whether the language of section 210 clearly resolves it. *Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986); *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (dictum).

We find two operative clauses in section 210 of PURPA. The first requires that the Commission prescribe such rules *"as it determines necessary* to encourage cogeneration[.]" The second limits the Commission's discretion by stating *"which rules require* electric utilities to—[purchase and sell.]" It is not easy to reconcile the two clauses. The Commission emphasizes the first, and Greensboro emphasizes the second. If the permissive language of the first were deemed to prevail over the more rigid wording of the second, the Commission would clearly enjoy some discretion to grant waivers so long as it determined that a literal adherence to the purchase and sale obligations was not necessary "to encourage cogeneration." If the second clause were deemed effectively to subsume the first, the Commission would enjoy less discretion.

In addition to the conflict between the two clauses, there is some ambiguity within the second clause itself. It refers generally to "electric utilities" rather than specifically to "[e]ach electric utility" as provided in the sections mandating the purchase and sale obligations. *See supra* at 519. The Commission hence argues that even if the second clause deprives it of discretion otherwise available under the first, the second clause itself gives the Commission enough discretion to grant the waivers requested here. That is because the use of the plural term "electric utilities" only requires the Commission to prescribe rules generally applicable to electric

utilities, but not necessarily applicable to each utility. That minimal flexibility, if accepted, would enable the Commission to argue that the grant of waivers, after careful study, to a particular association of small utilities is not contrary to PURPA.

While Oglethorpe and the EMCs agree with the Commission's reading of PURPA, Greensboro argues that the second clause prevails over the first. Greensboro contends, moreover, that the fact the term "electric utilities" is plural cannot support the weight the Commission places on it. As is often the case, the parties concede that neither side derives meaningful support from legislative history.

### B. *Deference to the Agency*

■ Because the relevant portion of PURPA is ambiguous, resolving the dispute before us requires either that we defer to the agency's choice among reasonable interpretations, or set aside the agency's policy selection in favor of our own construction of the statute. The Supreme Court has held that

> [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *TVA v. Hill,* 437 U.S. 153, 195 [98 S.Ct. 2279, 2302, 57 L.Ed.2d 117] (1978).

*Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793. Congress' clear commitment of PURPA's administration to the Commission is therefore all we need to defer to the agency if its construction of PURPA is reasonable. It is; therefore we do.

Section 210 permits the Commission to prescribe "such rules as it determines nec-

essary[,]" including section 292.403, but also requires it to issue purchase and sale regulations that apply as a general matter but not necessarily in specific cases. Greensboro nevertheless argues that even if "there is an ambiguity as to the legislative intent ... the Court must first decide which FERC interpretation is to be paid deference—FERC's original interpretation of Section 210 ... or the decision announced in this case, which is precisely opposite the original interpretation." Brief for Petitioner Greensboro at 16.

The Commission's "original interpretation," according to Greensboro, appears in the Commission's commentary accompanying the publication of section 292.303:

> The Commission interprets [section 210(a) of PURPA] to impose on electric utilities an obligation to purchase all electric energy and capacity made available from qualifying facilities with which the electric utility is directly or indirectly interconnected, except during periods described in § 292.304(f) or during system emergencies.

45 Fed.Reg. 12,219 (1980); *see* Brief for Petitioner Greensboro at 17.

That statement does not resolve, however, the issue whether the term "electric utilities" in section 210 means "[e]ach electric utility" as provided in 18 C.F.R. § 292.-303. More important, the Commission statement upon which Greensboro relies, and the waiver provision with which the statement purportedly conflicts, were published simultaneously. 45 Fed.Reg. 12,219 (1980). We are not persuaded that the Commission was simultaneously adopting Greensboro's construction of section 210 and permitting waiver of section 210 regulations.

Greensboro also argues that the Commission took a different position on the permissibility of waivers under section 210 in *Termination of Rulemaking Dockets; Certification of Compliance with Coastal Zone Management Act, et al.,* 48 Fed.Reg. 49,-028 (1983) ("*Colorado Ute*"). That case dealt with a request that the Commission promulgate regulations *requiring* interested "qualifying facilities," within the mean-

ing of section 210 of PURPA, to sell electricity to utility wholesalers rather than to the wholesalers' local distribution utilities. The Commission denied the request for such rulemaking, explaining in part that "[s]ince the obligation to purchase is a statutory requirement, the Commission did not waive it in the final rule implementing Section 210 of PURPA...." *Id.* at 49,031.

We reject Greensboro's argument that *Colorado Ute* represents an "original interpretation" of section 210 now abandoned by the Commission. The utilities in *Colorado Ute* made a general request that the Commission exempt them from a general requirement imposed by section 292.303. Here Greensboro challenges the Commission's statutory authority to grant a request for waivers of section 292.303 as applied to a particular situation. While the request in *Colorado Ute,* as a request for rulemaking, would have exempted a class of electric utilities to which the purchase regulation otherwise applied, the request for waivers in this case, as a request for adjudication, applies only to Oglethorpe and its EMCs. *See Oglethorpe I* at 61,284 (waiver regulations "permit waivers only with respect to individual utilities based on a showing by the applicant that designated standards have been met. Waivers en masse ... clearly [were] not contemplated by Congress.").

This is significant not because of the number of utilities exempted through one procedure compared to the other, but because adjudicative decision preserves a general rule in favor of the purchase and sale requirements of section 292.303 that can be surmounted only after a particularized showing before the agency. The rulemaking route rejected in *Colorado Ute* would have discarded the general rule, which the Commission reasonably reads in section 210, in favor of a general exemption from it.

This case concretely demonstrates how the Commission's interpretation of section 210 requires case-by-case determinations that a general rule in favor of section 292.-303 should be waived. The Commission's decisions to grant the waivers sought fol-lowed careful study of the relationship between Oglethorpe and the EMCs. The Commission also considered the interests of particular adverse parties like Greensboro. The result is an exception to an otherwise applicable general rule carefully crafted to fit particular circumstances.

### III. Conclusion

Section 210 of PURPA does not clearly bar the Commission from granting the waivers Oglethorpe and the EMCs requested. Because the Commission reasonably interpreted section 210 to allow such waivers and did not depart from any prior interpretation, we follow the rule of *Chevron* and affirm the Commission's decisions.

*So ordered.*