## GREENSBORO LUMBER COMPANY, Plaintiff-Appellant,

v.

## GEORGIA POWER COMPANY, et al., Defendants-Appellees.

### No. 86–8797.

United States Court of Appeals, Eleventh Circuit.

May 18, 1988.

---

Jack H. Watson, Jr., Atlanta, Ga., for plaintiff-appellant.

Emmet J. Bondurant, Atlanta, Ga., Richard G. Tisinger, Tisinger, Tisinger, Vance & Greer, P.C., Carrollton, Ga., for 39 EMC's.

L. Clifford Adams, Jr., Atlanta, Ga., for Mun. El. Auth. of Ga. & Def's 44–90.

James V. Davis, Landau, Davis and Farkas, P.C., Albany, Ga., for City of Albany, Ga.

Robert H. Forry, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Georgia Power Co.

Carlton C. McCamy, McCamy, Phillips, Tuggle, Rollins & Fordham, Dalton, Ga., for City of Dalton.

Robert B. Langstaff, Langstaff & Plowden, Albany, Ga., for City of Albany.

Dorothy Y. Kirkley, Paul, Hastings, Janofsky & Walker, Atlanta, Ga., Mark L. Gerchick, Paul, Hastings, Janofsky & Walker, Washington, D.C., for Oglethorpe Power Corp.

Bernhardt K. Wruble, Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Washington, D.C., for. Mun. Elec. Authority of Georgia.

C. Mac Vassanelli, Civil Div., Dept. of Justice, Washington, D.C., Robert L. Barr, Jr., U.S. Atty., Robert P. Edwards, Jr., Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Amicus Curiae Rural Electrification Admin.

Before HILL and VANCE, Circuit Judges, and PROPST *, District Judge.

HILL, Circuit Judge:

Plaintiff/appellant Greensboro Lumber Company ("Greensboro") brought this suit in the United States District Court for the Northern District of Georgia, alleging violations of the federal antitrust laws, violations of section 210 of the federal Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 824a–3 ("PURPA"), and state law breach of contract. The defendants, appellees in this court, are the Georgia Power Company ("Georgia Power"), the Municipal Electric Authority of Georgia ("MEAG"), the Georgia municipalities and county which participate in MEAG ("Participants"), the Oglethorpe Power Corporation ("Oglethorpe"), the 39 rural electric membership cooperatives that are members of Oglethorpe ("EMCs"), and the City of Dal-

ton ("Dalton"). The district court granted the defendants' motion for summary judgment, but denied the motion filed by MEAG and the Participants for sanctions under Rule 11 of the Federal Rules of Civil Procedure. *Greensboro Lumber Company v. Georgia Power Company*, 643 F.Supp. 1345 (N.D.Ga.1986).

The facts of this case are set out in detail in the very thorough district court opinion. *Id.* In summary, Greensboro operates an electrical cogeneration facility at one of its two lumber production facilities, and complains that the defendants have acted improperly in response to Greensboro's attempts to sell the power it produces and in response to Greensboro's requests to purchase back-up power.

This opinion generally deals with the issues in the case in the order in which they are addressed in the district court opinion.

## ANTITRUST CLAIMS AGAINST OGLETHORPE AND THE EMCS

We agree with the district court's conclusion that Oglethorpe and the EMCs (collectively, the "Oglethorpe Group") are immune from scrutiny under the federal antitrust laws.

Greensboro first argues that there were disputed questions of fact as to whether the Rural Electrification Administration ("REA") mandated the "all-requirements contracts," so that summary judgment was improper. These all-requirements contracts obligate the EMCs to purchase all of their wholesale power exclusively from Oglethorpe until the year 2022, thus preventing the EMCs from purchasing power separately from Greensboro. The district court held that the all-requirements contracts were required by the REA and therefore immune from antitrust scrutiny, relying on (1) arguments by the United States as *amicus curiae* that the REA has a long-standing policy of requiring such contracts as security for REA loans, 643 F.Supp. at 1362; (2) affidavits by the REA

* Honorable Robert B. Propst U.S. District Judge for the Northern District of Alabama sitting by designation.

Administrator supporting the United States' argument, *id.* at 1363; (3) the United States Supreme Court's rejection of an antitrust challenge to a utility's 20–year all-requirements contracts in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), 643 F.Supp. at 1362; and (4) the holding of this court (as the former Fifth Circuit) that virtually identical all-requirements contracts were valid and entitled to antitrust immunity in *Alabama Power Co. v. Alabama Electric Cooperative, Inc.*, 394 F.2d 672 (5th Cir.), *cert. denied*, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968), 643 F.Supp. at 1362.

We recognize that in reviewing the grant of appellees' summary judgment motions, this court exercises independent judgment and makes its own assessment of the record as to whether there was a genuine dispute as to any material issue of fact in the case. *Mays v. United States*, 763 F.2d 1295 (11th Cir.), *cert. denied*, 474 U.S. 998, 106 S.Ct. 416, 88 L.Ed.2d 365 (1985); *Thrasher v. State Farm Fire and Casualty Company*, 734 F.2d 637 (11th Cir.1984). Even under this standard, however, we hold that the district court was correct in concluding that the all-requirements contracts at issue in this case were required by the REA. Greensboro argues that there is a disputed issue of fact, pointing to inconsistencies between the two affidavits of the REA Administrator as to the policy of the REA. Greensboro's assertions are not sufficient to establish a factual dispute as to whether the REA required Oglethorpe and EMC's to enter into the all-requirements contracts which are at issue in this case. At most, Greensboro may have established a factual dispute about certain items of REA policy, but that is not sufficient for us to disagree with the district court's grant of summary judgment, because there is no substantial doubt that the REA required the contracts at issue in this particular case.

Greensboro next attacks the holding of antitrust immunity by seeking to distinguish *Alabama Power*. That case involved a loan from the REA to the Alabama Electric Cooperative ("AEC") for the purpose of financing a generating plant and high-voltage electrical distribution lines. 394 F.2d at 673. The loan was secured by all-requirements contracts between the AEC (similar to Oglethorpe in this case) and fourteen electric distribution cooperatives (similar to the EMCs). *Id.* at 675–76. The Alabama Power Company brought a complaint alleging that the all-requirements contracts violated the antitrust laws. *Id.* at 673. The district court addressed Greensboro's arguments on this issue, 643 F.Supp. at 1365–66, and we adopt the reasoning of the district court on this point.

Greensboro next argues that *Alabama Power* is no longer good law and should be overruled. On that point, we need only note that such a decision is beyond the power of the panel responsible for this decision. Only the en banc court has the power to overrule a prior decision by a panel of the court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981). Greensboro's citation to *Erkins v. Bryan*, 785 F.2d 1538, 1546 (11th Cir.), *cert. denied sub nom. United Steelworkers of America v. Erkins*, — U.S. —, 107 S.Ct. 455, 93 L.Ed.2d 402 (1986), does not persuade us otherwise.

It is argued that Oglethorpe and the EMCs constitute a single entity, and are thus incapable of conspiring with each other in violation of Section One of the Sherman Act. We question whether this "single entity theory" is applicable to Oglethorpe and the EMCs. *See Royal Drug Company, Inc. v. Group Life and Health Ins. Co.*, 556 F.2d 1375, 1380–82 (5th Cir.1977), *aff'd sub nom. Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).[1] However, we need not reach that question because of our decision that the all-require-

---

**1.** The further subsequent history, *Royal Drug Co., Inc. v. Group Life and Health Ins. Co.*, 737 F.2d 1433 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985), occurred after the creation of the Eleventh Circuit and is therefore not treated as precedent binding upon the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981).

ments contracts are immune from antitrust scrutiny under *Alabama Power*.

We also agree with the District Court's conclusion that Greensboro has suffered no cognizable injury from the alleged antitrust violations by Oglethorpe and the EMCs and therefore lacks standing to sue. *See* 643 F.Supp. at 1367–71.

As we agree with the district court's conclusion that Greensboro advances no antitrust claim sufficient to survive a motion for summary judgment, we find no merit in its claim for injunctive relief.

### PURPA CLAIMS AGAINST OGLETHORPE AND THE EMCS

■ Oglethorpe and the EMCs have adopted an Interconnection Policy under which only Oglethorpe will purchase electricity from Greensboro, and only the EMCs will sell electricity to Greensboro. Greensboro claims that this Interconnection Policy violates section 210 the federal Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 824a–3 ("PURPA"), which requires each electric utility both to sell electricity to co-generators such as Greensboro, and to purchase electricity from co-generators. The district court held that it lacked subject matter jurisdiction over Greensboro's "as applied" claim, and we find its reasoning persuasive. *See* 643 F.Supp. at 1371–75.

■ Greensboro also argues that the Oglethorpe/EMC Interconnection Policy fails to comply with PURPA on its face. This argument avoids the jurisdictional problem inherent in "as applied" claims under PURPA, *see* 643 F.Supp. at 1374, but we are not persuaded that we should reverse the district court's grant of summary judgment on this basis, either. Greensboro's "facial" attack on the Interconnection Policy asserts that the FERC granted waivers to Oglethorpe and the EMCs only prospectively, and that Oglethorpe and the EMCs have yet to obtain the FERC's acceptance of an amended Interconnection Policy. Therefore, Greensboro asserts that it is entitled to damages for the historical noncompliance, and an injunction to require future compliance.

Greensboro's "facial" attack on the Oglethorpe/EMC Interconnection Policy elevates form over substance. Greensboro has presented its arguments to the FERC. *See Greensboro Lumber Company v. Rayle Electric Membership Corporation*, 40 F.E.R.C. ¶ 61,283 (1987); *Oglethorpe Power Corporation, et al.*, 35 F.E.R.C. ¶ 61,069 (1986), *aff'd sub nom. Greensboro Lumber Company v. Federal Energy Regulatory Commission*, 825 F.2d 518 (D.C.Cir.1987); *Oglethorpe Power Corporation, et al.*, 32 F.E.R.C. ¶ 61,103 (1985), *aff'd sub nom., Greensboro Lumber Company v. Federal Energy Regulatory Commission*, 825 F.2d 518 (D.C.Cir.1987). The FERC has in substance concluded that it need not take any action against Oglethorpe. *See* 40 F.E.R.C. ¶ 61,283. Consequently, we are not persuaded that Greensboro could prevail on either its claim for damages or its claim for injunctive relief, and we affirm the district court's grant of summary judgment.

### PENDENT STATE LAW BREACH OF CONTRACT CLAIM AGAINST OGLETHORPE

Since we agree with the district court's grant of summary judgment to Oglethorpe and the EMCs on all of the federal claims against them, we also agree with that court's decision not to exercise pendent jurisdiction over Greensboro's state law claim for breach of contract. *See* 643 F.Supp. at 1375.

### ANTITRUST CLAIMS AGAINST MEAG AND THE PARTICIPANTS

The district court held that the actions of MEAG and the Participants are immune from antitrust scrutiny under the state action immunity doctrine, as set out in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and extended in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) and *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). 643 F.Supp. at 1375–83. Greensboro does not

raise this issue on appeal, and we do not address it here.

## PURPA CLAIMS AGAINST MEAG AND THE PARTICIPANTS

Greensboro's PURPA claims against MEAG fall into two categories. *See* 643 F.Supp. at 1383–85. Both of these categories deal with the Interconnection Policy of MEAG and the Participants (collectively, the "MEAG Group"). The MEAG Group's Interconnection Policy is similar to, but more limited than, that of Oglethorpe and the EMC's discussed above.[2]

■ The first category of Greensboro's PURPA claims against the MEAG Group concerns their refusal to sell electricity at retail to Greensboro. Greensboro claims that regulations promulgated by the Federal Energy Regulatory Commission under PURPA requires MEAG and the Participants to each offer to sell electricity to Greensboro. 18 C.F.R. § 292.303(b) (1987).[3] Greensboro complains that the MEAG Group's Interconnection Policy prevents sales of electricity from MEAG to Greensboro, in violation of this regulation.

The district court concluded that Greensboro lacks standing to raise this claim. A provision of the Georgia Territorial Electric Service Act, O.C.G.A. § 46–3–11(b)(4) (1982), would prevent MEAG from selling to Greensboro even in the absence of the Interconnection Policy. 643 F.Supp. at 1384. Thus, according to the district court, Greensboro lacks standing because the relief it seeks would not redress its alleged injury. *Id.* The district court rejected Greensboro's argument that PURPA pre-empts the Georgia Territorial Electric Service Act, observing that PURPA lacks the requisite "clear expression" of an intent to pre-empt state territorial service laws, and that the Georgia Territorial Electric Service Act is consistent with the objective of section 210 of PURPA. *Id.* Greensboro's arguments to the contrary do not persuade us that the district court should be reversed.

■ The second category of Greensboro's PURPA claims against the MEAG Group concerns the portion of the Interconnection Policy which forbids the Participants from each, separately, purchasing electricity from Greensboro. The Oglethorpe group obtained a waiver from the FERC validating the buy/sell arrangements under its interconnection policy. 643 F.Supp. at 1373–74; *see Greensboro Lumber Company v. Rayle Electric Membership Corporation,* 40 F.E.R.C. ¶ 61,283 (1987); *Oglethorpe Power Corporation, et al.,* 35 F.E.R.C. ¶ 61,069 (1986), *aff'd sub nom. Greensboro Lumber Company v. Federal Energy Regulatory Commission,* 825 F.2d 518 (D.C.Cir.1987); *Oglethorpe Power Corporation, et al,* 32 F.E.R.C. ¶ 61,103 (1985), *aff'd sub nom., Greensboro Lumber Company v. Federal Energy Regulatory Commission,* 825 F.2d 518 (D.C.Cir.1987). The district court concluded that "[t]he FERC's decision in the *Oglethorpe* case *a fortiori* validates the MEAG Group's Interconnection Policy regarding purchases." 643 F.Supp. at 1385. The district court reasoned that "[b]ecause Oglethorpe's authority to make power purchases at all levels for the EMCs was affirmed by the FERC, it follows *a fortiori* that MEAG's more-limited authority to make power purchases only at higher capacity levels is consistent with PURPA." *Id.*

---

**2.** The MEAG Group's Interconnection Policy, like that of the Oglethorpe Group, specifies that only a Participant may sell electricity to Greensboro, and only MEAG may purchase electricity from Greensboro. However, the MEAG Group's Interconnection Policy provides that the Participants, not MEAG, are the designated purchasers of electricity from co-generators whose facilities are designed to produce 100 kilowatts or less. In contrast, the EMCs do not purchase electricity from any co-generator. Oglethorpe makes these purchases on behalf of the EMCs from all co-generators regardless of size. This difference does not directly cause any difference between MEAG's and Oglethorpe's relationships with Greensboro; Greensboro's co-generation facility is designed to produce 7.5 megawatts, well above the 100 kilowatt threshold.

**3.** 18 C.F.R. § 292.303(b) provides that "[e]ach electric utility shall sell to any qualifying facility, in accordance with § 292.305, any energy and capacity requested by the qualifying facility."

Greensboro argues that the district court's conclusion as to the second category of PURPA claims is erroneous. Greensboro points out that the FERC granted the waiver to Greensboro only conditionally, and that the MEAG Group's Interconnection Policy does not contain certain provisions which the Oglethorpe interconnection policy contains, and which the FERC found necessary for compliance with PURPA. Furthermore, Greensboro argues that MEAG bears the burden of showing that enforcement of the regulations is not necessary to encourage cogeneration, that waivers are granted only on a case-by-case basis, and that the determination is heavily fact-specific. Therefore, according to Greensboro, the necessity for Oglethorpe to obtain a waiver demonstrates that MEAG's parallel Interconnection Policy is in violation of PURPA, and Greensboro is entitled to redress for this violation since MEAG has neither sought nor obtained the necessary waiver for itself.

Greensboro's arguments again elevate form over substance, and we affirm the district court on this point as well. While it is true that MEAG has never gone through the formal waiver process, it appears that the result of such a proceeding would be a foregone conclusion, given the grant of waivers to Oglethorpe by the FERC. Greensboro has pursued, before the FERC, a challenge to the MEAG Group's Interconnection Policy, and the outcome of that case clearly implies that the FERC sees no significant difference between the Interconnection Policies of the MEAG Group and the Oglethorpe group. In dismissing Greensboro's complaint against MEAG, the FERC observed that

[t]he complaint is not barred by res judicata because MEAG and the MEAG participants were not parties to the Oglethorpe waiver proceeding. Nevertheless, under section 210(h) of PURPA and section 306 of the FPA, we decline to investigate the complaint and to establish hearing procedures. When Greensboro filed its complaint, the Oglethorpe/EMC waivers had not been granted and it was unclear how the Commission and the courts would interpret section 210 of

PURPA. In light of the subsequent decisions in the Oglethorpe/EMC waiver proceeding and here, we see no reason to take further action on Greensboro's complaint against MEAG and the MEAG participants.

40 F.E.R.C. ¶ 61,283 at 61,919 (footnote omitted).

The Participants, like the EMCs, do buy electricity from cogenerators, in the same manner as they buy all their electricity. In meeting their overall needs for electricity, the Participants purchase most of their requirement from MEAG, and the EMCs purchase most of their requirements from Oglethorpe. Where cogenerators are involved, the Participants buy from all but very small cogenerators through MEAG, and the EMCs buy from cogenerators through Oglethorpe. This is the sensible way for the Participants and EMCS to acquire their electricity; it is in fact so sensible that the FERC appears to have had no trouble in approving it.

Congress enacted the provisions of PURPA at issue in this case because it deemed it important that there be a market for cogenerators' electricity. However, as long as cogenerators have the opportunity to sell their electricity at reasonable prices, we find nothing to indicate Congressional intent that organizations like the Participants and the EMCs should have to make special changes in their means of acquiring electricity. The MEAG/Participant and Oglethorpe/EMC agreements give cogenerators the opportunity to sell to the Participants through MEAG and to the EMCs through Oglethorpe. We find that sufficient.

## OTHER ISSUES

We agree with the district court's decisions on the MEAG Group's motion for sanctions against Greensboro under Fed.R. Civ.P. 11, and on Greensboro's remaining antitrust claims against Dalton and Georgia Power, and we need not supplement the district court's analysis. *See* 643 F.Supp. at 1385.

The opinion of the district court is AFFIRMED.

VANCE, Circuit Judge, dissenting.

I dissent. I do not necessarily disagree with the legal conclusions set forth in the majority's opinion. Rather, my problem with the district court's judgment stems from the fact that the court granted the defendants' motions for summary judgment without allowing Greensboro the opportunity to conduct discovery, a fact the majority simply ignores.

## A.

At the outset, the case's procedural history is worth mentioning. Greensboro filed its complaint on October 5, 1984 and shortly thereafter began its discovery efforts. On December 27, however, the district court granted the defendants' motion to stay discovery. The court's order stayed indefinitely all discovery pending the defendants' answers and any dispositive motions. The order indicated that if Greensboro needed discovery to respond to a motion for summary judgment it could file an affidavit under Rule 56(f) along with a discovery plan outlining the discovery required.[1]

By February 1985 the defendants had all filed motions to dismiss or for summary judgment. On February 26 Greensboro amended its complaint and filed a motion to lift the stay of discovery. After the defendants renewed their motions to dismiss or for summary judgment Greensboro filed an affidavit pursuant to Rule 56(f). In the affidavit Thomas Gutherie, Greensboro's president, stated that Greensboro could not present the facts necessary to oppose the defendants' motions for summary judgment until given the opportunity to conduct discovery.[2] Along with the affidavit Greensboro filed a proposed discovery plan outlining the discovery required to respond to the defendants' motions.

At a September 9 status conference the district court heard oral argument on all pending motions. At that time Greensboro reiterated its need for discovery and renewed its motions to lift the stay of discovery or to permit discovery under its proposed plan. Almost one year later on August 29, 1986, the court entered its order granting the defendants' motions for summary judgment. The court's order made no mention of Greensboro's motion to lift the stay of discovery or of its Rule 56(f) affidavit.

## B.

Rule 56(f) allows a court to deny a motion for summary judgment or order a continuance when a party sets forth by affidavit sufficient reasons for its inability to present facts in opposition to the motion. The rule was designed to give parties a reasonable opportunity to prepare a case, and it is frequently invoked when there has not been a sufficient opportunity to conduct discovery. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2741 (1983). Summary judgment is rarely appropriate before the party opposed to the motion has had at least some opportunity to gather material facts through discovery. *See, e.g., WSB–TV v. Lee*, 842 F.2d 1266, 1269 (11th Cir.1988); *Murrell v. Bennett*, 615 F.2d 306, 310–11 (5th Cir.1980); *Service, Hosp., Nursing Home and Pub. Employees Union v. Commercial Property Servs.*, 755 F.2d 499, 507 (6th Cir.), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). This is especially true in antitrust cases, where the material facts are likely to be in the exclusive control of the defendants. *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.

---

**1.** Rule 56(f) of the Federal Rules of Civil Procedure provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**2.** The affidavit set forth the specific areas in which Greensboro needed discovery in order to respond to the motions for summary judgment.

2d 338 (1976); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 555 (2d Cir.1977).

To be sure, it is not always improper to grant summary judgment prior to discovery. For instance, if the nonmoving party cannot demonstrate in a Rule 56(f) affidavit that discovery might uncover evidence that would create a dispute as to a material fact, summary judgment is appropriate. *See Hancock Indus. v. Schaeffer,* 811 F.2d 225, 229–30 (3d Cir.1987); *see also Wallace v. Brownell Pontiac-GMC Co., Inc.,* 703 F.2d 525, 528 (11th Cir.1983) (discovery would have been useless as plaintiff's own version of the facts were insufficient to support the action). Here, however, Greensboro's Rule 56(f) affidavit together with its proposed discovery plan was more than sufficient to warrant at least a continuance.

In affirming the district court's grant of summary judgment the majority accepts the court's conclusion that the all-requirements contracts between Oglethorpe and the EMCs were required by the REA. Greensboro, however, consistently has disputed this fact and specifically sought discovery on the issue in its Rule 56(f) affidavit and accompanying discovery plan. The court should have allowed Greensboro to conduct limited discovery into the matter so that Greensboro could respond to the defendants' affidavits. In addition, Greensboro should have been allowed limited discovery into the relationship among the defendants and the various agreements between them. Given the one-sided presentation the district court was faced with in ruling on the motions for summary judgment, I do not have confidence in its conclusion that Greensboro suffered no injury from the defendants' alleged antitrust violations.

### C.

I do not suggest that the result in this case would have been different had the district court allowed Greensboro to conduct discovery. It may be that the discovery requested would not have created a dispute as to a material fact. As the Third Circuit once stated, however, in reversing a grant of summary judgment in a somewhat analogous case:

> This case illustrates the danger of founding a judgment in favor of one party upon his own version of facts within his sole knowledge as set forth in affidavits prepared ex parte. Cross-examination of the party and a reasonable examination of his records by the other party frequently bring forth further facts which place a very different light upon the picture.

*Toebelman v. Missouri-Kansas Pipe Line Co.,* 130 F.2d 1016, 1022 (3d Cir.1942). Accordingly, I respectfully dissent.