518 So.2d 373 (1987)
Dr. Louis BARROSO, Appellant,
v.
RESPIRATORY CARE SERVICES, INC., Appellee.
Nos. 87-81, 87-370.
District Court of Appeal of Florida, Fifth District.
December 24, 1987.
Rehearing Denied January 21, 1988.
*374 Joseph H. Williams of Troutman, Williams, Irvin, Green & Troutman, P.A., Winter Park, for appellant.
Chris Ballentine of Fisher, Rushmer, Werrenrath, Keiner, Wack & Dickson, P.A., Orlando, for appellee.
COBB, Judge.
The issue in this appeal is whether the trial court erred in denying the appellant's motion for a judgment in accordance with his motion for a directed verdict.
Appellee, Respiratory Care Services, Inc. (RCS), is a corporation that provides in-house respiratory therapy services to small hospitals on a contractual basis. Its president is Ahmad Y. Saidi. Pursuant to a service agreement, RCS began providing in-house respiratory services at Orlando General Hospital (OGH) in 1972. Under that agreement, RCS was to receive 50% of the gross posted income for respiratory therapy, including in-patient and out-patient charges. RCS was also responsible for half of the medical director's fees, *375 which were subtracted from the 50% gross patient charge that RCS received.
In 1974, appellant, Dr. Louis Barroso, began practicing osteopathic medicine at OGH, and subsequently was appointed medical director of the cardiopulmonary department. As medical director, he was the hospital's representative, with ultimate authority in the department concerning medical problems; he was also responsible to ensure that good quality technicians were employed.
RCS performed arterial blood gas (ABG) tests[1] as part of OGH's cardiopulmonary department. In January, 1982, Barroso presented a proposal to the OGH Board of Trustees Finance Committee calling for professional interpretation of the ABG tests. He proposed that he be paid $8.00 for each ABG interpretation, one-half to come from RCS and one-half to come from OGH. The proposal was approved by the finance committee and subsequently by the Board of Trustees. Although Barroso knew of the agreement between OGH and RCS, he did not discuss his proposal with Saidi, but went directly to the OGH Board. After the procedure was implemented, Barroso received his ABG interpretation fees from OGH through checks mailed monthly to Louis Barroso, P.A.
RCS learned of Barroso's proposal and OGH's approval of the proposal through a letter sent to Saidi by OGH's hospital administrator, which was dated January 28, 1982. Saidi reluctantly decided to go along with the decision rather than jeopardize his ongoing deal with OGH. Consequently, he increased the charge to patients for the ABG testing.
In February, 1982, RCS personnel were instructed by Barroso to run the ABG results through an in-house computer for interpretation of the tests. For the first few days after this procedure was implemented, Barroso personally reviewed and signed the computer sheets. Within a week after the new ABG computer interpretation procedures began, Barroso supplied Mike McCumber, RCS's chief therapist at OGH, with a rubber stamp and instructed him to stamp Barroso's name on the computer sheets. Barroso was to be notified only if there was anything abnormal or unusual about the results. After Barroso gave McCumber the rubber stamp, Barroso did not personally look at or interpret any of the ABG tests before they went to the hospital floor. McCumber testified that this procedure became a joke in the department because McCumber was doing Barroso's work while Barroso was being paid for it. At trial Saidi acknowledged that he never protested the use of the signature stamp to Barroso.
An investigation by two hospital administrators concerning the ABG test interpretation procedure resulted in Barroso's appearance before the OGH Trustee Executive Committee in February, 1983. At the meeting, Barroso represented that he was reading each ABG test. Based on this representation, the Board of Trustees allowed Barroso to continue interpreting the ABG tests.
From November, 1982, through early 1983, Saidi, on behalf of RCS, began negotiating a new contract with OGH. Saidi proposed that RCS receive a flat fee for its services in performing the ABG tests. In February, 1983, Saidi reached what he thought was a five-year contract with OGH effective March 15, 1983, which he confirmed in writing. Saidi believed that under the new agreement he would no longer have to pay ABG interpretation fees as of March 15, 1983. In fact, for 15 days in March and the whole month of April, OGH did not deduct the ABG fee from RCS's share of the gross revenue. In May, 1983, however, OGH once again began deducting the ABG fees from RCS's revenue. Saidi then called a meeting with two board members and threatened to report the issue to *376 Medicare. In August of 1983, he received a notice terminating his contract, and Saidi subsequently filed a complaint with Medicare. Saidi never expressed any objections in writing to anyone about Barroso being paid for the ABG interpretation, until August, 1984, when he wrote a letter to Barroso complaining about the procedure.
Because of the contract termination, RCS sued Barroso for counts alleging (1) breach of an oral contract; (2) intentional interference with a contractual or business relationship between RGS and OGH; (3) fraud; and (4) violations of the Racketeer Influenced and Corrupt Organization Act (RICO).[2]
The jury rendered a verdict in favor of RCS and against Barroso on all counts, awarding damages of $42,124, but declining to assess punitive damages. Barroso filed a motion for a judgment in accordance with his motion for a directed verdict and a motion for new trial. The motions were denied. The trial court entered final judgment trebling the jury award under the RICO provisions and assessing prejudgment interest. The trial court also determined that RCS was entitled to recover attorneys' fees and costs from Barroso.
We first consider the validity of the award based upon breach of an oral contract. Barroso contends there was no meeting of the minds, and, hence, there was no contract between himself and RCS. We agree. His proposal was directed to, and accepted by, the OGH Board of Trustees. The fact that OGH was willing to require that RCS pay one-half of Barroso's interpretation fee as a condition of continuing its agreement with RCS did not create a contract between Barroso and RCS. In order for such a contract to have existed, mutual or reciprocal assent must be shown. Blake v. Munce, 426 So.2d 1175 (Fla. 5th DCA 1983). RCS's reluctant assent was given to OGH, not Barroso; thus, no oral contract ever existed.
In asserting intentional interference with its contract with OGH, RCS, in effect, is conceding that Barroso was not a party to that contract since such tortious interference can only be charged against a third person. See Days v. Florida East Coast Railway Company, 165 So.2d 434 (Fla. 3d DCA 1964). Barroso was a third party to the RCS-OGH contract and, therefore, legally in a position to tortiously interfere with it. The question is whether there was evidence at trial that Barroso intentionally and unjustifiably interfered with RCS's contractual relationship with OGH. See Heavener, Ogier Services, Inc. v. R.W. Florida Region, Inc., 418 So.2d 1074, 1076 (Fla. 5th DCA 1982). The evidence is clear that Barroso was pursuing his own legitimate economic goals in seeking a fee arrangement with OGH. RCS agreed to the ABG interpretation fees and allowed its share to be taken out of its gross revenues for over one year. It did so in order to preserve its own economic interest. There was no evidence to support the jury's determination that there was an intentional interference with the OGH-RCS contract.
In regard to the alleged fraud, we note that the elements of actionable fraud are (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party. Lance v. Wade, 457 So.2d 1008 (Fla. 1984). In its brief, RCS states:
The fraud occurred when Dr. Barroso misrepresented to the Board of Trustees that he would interpret each and every arterial blood gas test, which resulted in the Board approving his proposal and requiring payment for `interpretation' by RCS. Not only was RCS defrauded by this conduct, but Dr. Barroso used a back door method to prevent RCS from even preventing the fraud from occurring. The approval of the ABG procedure was ultimately presented to RCS as a fait accompli.
*377 The problem with this analysis is that the asserted "fraud" was not directed against RCS; rather, it was directed against OGH and the public, who are not complaining. Moreover, it was committed by RCS, acting through its agent, McCumber, in conjunction with Dr. Barroso. Finally, Saidi was well aware of the "rubber stamp" procedure. This is a case of the pot suing the kettle for being black. It follows, therefore, that the count based on the RICO violations is equally untenable, and the award of attorneys' fees and costs pursuant to the RICO violations must also be reversed.
Since there was no evidence presented upon which the jury could have lawfully returned a verdict in favor of RCS as to any of the counts in the complaint, the trial court erred in denying Barroso's motion for a judgment in accordance with his motion for a directed verdict. Accordingly, the judgment entered below is reversed and the cause is remanded for entry of judgment in favor of Barroso.
REVERSED and REMANDED.
ORFINGER, J., and LEE, R.E., Jr., Associate Judge, concur.
NOTES
[1] An ABG test determines the level of oxygen and the acid-base status of the blood. RCS would perform the ABG tests by having a respiratory therapist draw a sample of blood from the patient, take the specimen to and place it inside a machine called a blood gas analyzer, and write down the numbers given by the machine onto a blood gas analysis form. It took a maximum of 15 minutes from the time RCS got an order for an ABG test until the results were back on the hospital floor; medical necessity required immediate analysis of the results.
[2] Ch. 895, Fla. Stat. (1985).