WILLIAMS ELECTRIC COMPANY, INC., Plaintiff,

v.

HONEYWELL, INC., et al., Defendants.

No. 86–04374–RV.

United States District Court, N.D. Florida, Pensacola Division.

April 16, 1991.

---

See also 854 F.2d 389.

James E. Moore, Moore & Moore, P.A., Niceville, Fla., Kimberly Cornelson, M. Jerome Elmore, Bondurant, Mixson & Elmore, Atlanta, Ga., for Williams Elec. Co.

Hal K. Litchford, Litdhord, Christopher & Milbrath, P.A., Orlando, Fla., Paul A. Koches, Joseph Brooks, Popham, Haik, Schnobrich & Kaufman, Ltd., Washington, D.C., for Honeywell.

William C. Owen, Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, P.A., Tallahassee, Fla., for John Geis and Honeywell, Inc.

## ORDER GRANTING SUMMARY JUDGMENT

VINSON, District Judge.

Pending in this case are several motions, including the motion to dismiss, or in the alternative for summary judgment, filed by defendants Honeywell and Geis. (Doc. 184). For the reasons stated below, that motion is GRANTED as to all counts except Counts XIX and XX, and Counts XIX and XX are DISMISSED, without prejudice.

## I. FACTUAL BACKGROUND.

The factual record in this case is voluminous. For the sake of brevity, I discuss many of the factual details in this opinion only as they become relevant, with this very brief review of the factual setting as background.

Defendant Honeywell installed the Energy Management Control System (EMCS) at Sheppard Air Force Base, Texas (Sheppard), prior to the events in this case. The EMCS contract between the United States Air Force and Honeywell required that Honeywell alone could perform work on certain aspects of the EMCS for all future work done on the EMCS system. Plaintiff alleges that the contract required only recommendations from Honeywell, and only on certain limited aspects of future EMCS work.

Plaintiff won a later general contract for work at Sheppard. Section 13A of this contract dealt with the EMCS system. Honeywell had unsuccessfully bid on this section. There were five listed items [1] within Section 13A which the Air Force later required to be done by Honeywell.

Williams wanted to perform all of the Section 13A work itself. It quoted cost estimates below $100,000, some as low as $30,000, to do the work. Honeywell, however, also wanted to perform all of Section 13A work itself. Williams alleges that Honeywell threatened the Air Force with withdrawal of its warranties if it gave any part of Section 13A to Williams. The Air Force then told Williams it had to use Honeywell for the five listed items within Section 13A.

Williams further alleges that Honeywell then illegally tied its performance of the five listed items to getting *all* of the Section 13A work. Because of the Air Force's requirement that Honeywell perform the five listed items, and Honeywell's general "market power," Williams was forced to use Honeywell for all of the Section 13A work.

Honeywell estimated the cost of the work to be $410,000, a figure Williams charges is grossly exorbitant. The Air Force's original cost estimate was $107,000, an amount close to Williams' later estimate. Honeywell then sent in its cost estimate, allegedly to "justify its price," and the Air Force later revised its cost

---

1. Some parts of the record refer to six listed items. The exact number is irrelevant to any pending motion.

estimate to over $400,000 in accord with Honeywell's estimate.

Honeywell also required that defendant J.V. Clark Electric Company, Inc. (Clark) be used as a sub-sub-contractor on Section 13A work. Clark would receive a portion of the $410,000. Williams alleges that Clark conspired with Honeywell in this way: Honeywell would do the above-alleged things to force Williams to use Honeywell on Section 13A; Honeywell would insist on using Clark as sub-subcontractor; Clark would use only Honeywell products as it performed its portion of the work.[2]

Williams claims that, as a result of all of this, it had to pay out $410,000 for a job it could have performed itself for approximately $30,000. Williams claims a loss in profits of $680,000. It also claims a loss in operating capital that reduced its bonding capacity. It alleges that the reduction in operating capital forced it to forego earning credit for making early payments, and in some cases forced it to make late payments and pay late fees. Williams also complains of lost business opportunity, and a loss in business reputation caused by the late payments. The total of damages Williams seeks is $2 million.

Williams is suing Honeywell and one of its officers, John Geis (Geis)[3]; and Clark and one of its officers, William Warren Harmon (Harmon). In addition to various antitrust claims under federal[4] and state[5] law, Williams alleges state law torts, including tortious interference with contract,[6] fraud[7], and violation of the Texas Deceptive Trade Practices Act.[8]

## II. LEGAL STANDARD.

A motion for summary judgment should be granted when "the pleadings, deposi-

tions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof." *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 351 (11th Cir.1989), *cert. denied sub nom., Spears v. Cornelius*, —— U.S. ——, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Id.*

On a summary judgment motion, the record and all inferences that can be drawn from it, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Furthermore, the court must consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the parties. *See Clinkscales v. Chevron USA, Inc.*, 831 F.2d 1565, 1570 (11th Cir.1987).

---

**2.** Williams and Honeywell both took their dispute to the Air Force, which eventually decided that if Williams did not agree to Honeywell's conditions, it would be in breach of its contract with the Air Force. Before bringing this suit, Williams appealed this decision to the Armed Services Board of Contract Appeals (ASBCA). The ASBCA appeals were settled on January 28, 1988. Under the terms of the settlement, the government paid Williams $365,211.75.

**3.** Movants Honeywell and Geis will sometimes be referred to collectively as "Honeywell."

**4.** Counts I through Vb.

**5.** Counts VI through XIII.

**6.** Counts XIV and XV.

**7.** Counts XVI through XVIII.

**8.** Counts XIX and XX.

## III. ANTITRUST IMMUNITY.

*(A.) Federal Antitrust Liability.* Defendants argue that they are immune from antitrust liability because, in entering into the contractual arrangement challenged by Williams, they acted at the direction of federal officials, who are themselves immune from antitrust liability. In considering their argument, I am mindful that "repeals of the antitrust laws by implication ... are strongly disfavored." *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973), *citing United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 350–351, 83 S.Ct. 1715, 1734–1735, 10 L.Ed.2d 915 (1963).

However, it appears well-settled that federal agencies and their officials acting in their official capacity are immune from federal antitrust liability. *See United States v. Cooper Corp.,* 312 U.S. 600, 606, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941); *Sakamoto v. Duty Free Shoppers, Ltd.,* 764 F.2d 1285 (9th Cir.1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986); *Dept. of Water & Power v. Bonneville Power Administration,* 759 F.2d 684 (9th Cir.1985); *Sea–Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243 (D.C.Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982); *Feldman v. Gardner,* 661 F.2d 1295 (D.C.Cir.1981), *cert. granted sub nom. District of Columbia Court of Appeals v. Feldman,* 458 U.S. 1105, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982), *vacated on other grounds,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

The case law relating to the immunity of private parties dealing with the federal government is somewhat more sparse. Two opinions of the Supreme Court of the United States support the extension to private actors acting within the direction of the federal agency. In *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), a unanimous Court held that where Congress gave the Securities and Exchange Commission the power to approve stock exchanges' system of fixed commission rates, the Commission *and the stock exchanges* were immune

from antitrust liability. 422 U.S. at 689–690, 95 S.Ct. at 2614–2615.

Similarly, in *United States v. Nat'l Assoc. of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), the Court held that where Congress empowered the SEC to approve certain self-imposed horizontal restrictions on the transferability of mutual fund shares, the mutual funds, broker-dealers, and other private parties involved were immune under the antitrust laws. I believe these cases support the proposition that private parties are shielded from federal antitrust liability where their actions were regulated by a federal regulatory agency acting pursuant to congressional authority, and the action in question was authorized or directed by that regulatory agency.

Defendants cite a case from within this circuit supporting their view. In *Medical Ass'n v. Schweiker,* 554 F.Supp. 955, 966 (M.D.Ala.1983), the Middle District of Alabama held that:

> ... private parties to the extent they are acting *at the direction or with the consent of federal agencies* also fall outside the pale of the [Sherman] act's prohibition. (emphasis added).

The Eleventh Circuit affirmed the Middle District in a per curiam opinion. *Medical Ass'n v. Heckler,* 714 F.2d 107, 108 (11th Cir.1983).

Defendants also rely upon *Greensboro Lumber Co. v. Georgia Power Co.,* 643 F.Supp. 1345 (N.D.Ga.1986), *aff'd,* 844 F.2d 1538 (11th Cir.1988), in which the Rural Electrification Administration (REA) required REA cooperative generating and transmitting ("G & T") wholesale suppliers of electricity to enter into "all-requirements" sales contracts with its REA cooperative retail electricity distributors as a condition for receiving federal loans. The contracts required the distribution co-ops to buy all their non-self-generated electricity from or through the "G & T" REA cooperative. This, of course, would be in violation of the antitrust laws, but for the REA's "all-requirements" mandate. In the Public Utility Regulatory Policies Act of 1978 ("PURPA"), Congress mandated that

all electric utilities were obligated to buy electricity from non-utility self-generators of electricity. Greensboro Lumber Co. is such a self-generator, and it sought to have the local REA distribution cooperative (which was the electric utility serving its area by state regulation) purchase its excess electric energy and capacity in accordance with PURPA. The distribution cooperative declined to do so, and Greensboro Lumber asked the court to declare the REA cooperative's refusal to purchase as, among other things, a violation of the federal antitrust laws. The district court granted summary judgment for the REA cooperatives on the ground that they were immune from federal antitrust liability, citing the former Fifth Circuit's opinion in *Alabama Power Co. v. Alabama Electric Cooperative, Inc.*, 394 F.2d 672 (5th Cir.), cert. denied, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968). The Eleventh Circuit affirmed summary judgment for the defendants despite a disputed issue of fact on the details of REA policy, "because there is no substantial doubt that *the REA required the contracts at issue in this particular case.*" *Greensboro Lumber Co. v. Georgia Power Co.*, 844 F.2d 1538, 1541 (11th Cir.1988) (emphasis added). *But see Hecht v. Pro–Football, Inc.*, 444 F.2d 931, 934 n. 6 (D.C.Cir.1971).

*Alabama Power Co. v. Alabama Electric Cooperative, Inc., supra*, dealt with similar REA-mandated all-requirements contracts. The former Fifth Circuit affirmed dismissal of the antitrust claims brought against the private defendants in that case, holding that the contracts "were the result of valid governmental action and, hence, not violative of the antitrust laws." 394 F.2d at 673, 676–677.

Williams attempts to distinguish *Greensboro Lumber Co.* and *Alabama Power Co.* on a number of grounds. First, it notes that the REA had a "long-standing policy"

of requiring the type of contract in question. *See Greensboro Lumber Co., supra*, 844 F.2d at 1540–1541. Williams argues at length that there was no governmental policy in effect requiring "sole-sourcing" on EMCS systems. *See* doc. 194, plaintiff's response to Honeywell's motion, at 72–84.[9] But it is only the district court that relies upon such a government policy. The Eleventh Circuit explicitly dismisses the existence of a policy as unimportant, ruling in that instance that immunity attached because "there is no substantial doubt that the REA required the contracts at issue." *Greensboro Lumber Co., supra*, 844 F.2d at 1541.

Nor does *Alabama Power Co.* require the existence of a "policy." While the opinion refers to the REA's "customary and long-established practice" of all-requirements contracts, it apparently does so only to show that such contracts are not beyond an "outer perimeter" of the REA's statutory authority. *Alabama Power Co., supra*, 394 F.2d at 676. The clear implication is that as long as the required contractual arrangement is within the "outer perimeter" of statutory authority, immunity attaches both to the federal agency mandating the anticompetitive action and the private party doing it. *See id.* at 676–677. The existence of a long-standing policy is *not* the touchstone.

Williams next points out that the district court's opinion in *Greensboro Lumber Co.* emphasized *Congress' knowing acquiescence* in the REA's "long-established practice" of compelling all-requirements contracts. 643 F.Supp. at 1364. Pointing to authority from other circuits requiring specific congressional consent to any creation of antitrust immunity,[10] Williams argues that the "REA" cases are distinct.

I agree that there may be reasons to reexamine the "REA" cases in other factual

---

9. Honeywell responds, also at length, by arguing that the ATC "Policy Letter No. 4" represented such a "policy." Because I conclude that the existence of a "policy" is not a prerequisite, I need not decide this issue.

10. *See, e.g., Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 82 (2d Cir.1981)

(unless a regulatory scheme is "so pervasive that Congress must be assumed" to have intended antitrust immunity, immunity exists only when "an agency, acting pursuant to a *specific Congressional directive,* actively regulates the particular conduct challenged") (emphasis added).

contexts, but *Greensboro Lumber Co.* and *Georgia Power Co.* are the law of this circuit. Moreover, there is general congressional authorization for the Air Force's contract action at issue here. In the Armed Services Procurement Act [10 U.S.C. § 2301 et seq.], Congress has explicitly granted the Air Force (and all Department of Defense agencies) authority to make determinations in the procurement process like those made in this case by McNeely.

Title 10, United States Code, Section 2304(c) specifies the situations in which a "head of an agency may use procedures other than competitive procedures." Section 2303(a)(4) lists the Air Force as such an "agency," and Section 2311 authorizes an agency head to delegate any power (with an exception that does not apply here) under the chapter. *See also* § 2321(f) (authorizing the contracting officer to validate a contractor's restrictions on the use of proprietary data). These provisions are administratively implemented in the Federal Acquisitional Regulations. [*See* 48 C.F.R., Part 6, Subpart 6.3.]

If base contracting officer McNeely is viewed as having originally ordered sole sourcing only as to the five listed items, and then having expanded that order to include all of the Section 13A work to resolve the Williams–Honeywell dispute, that action may also enjoy explicit congressional authorization. Section 2310 empowers the agency head or his designee to issue "determinations and decisions" relating to contract disputes, which is exactly what McNeely issued as the final resolution of the dispute.

In sum, I conclude that the law of this circuit is that when a federal agency or official is authorized by law to, and does, direct or require a non-government party's anticompetitive conduct, the non-government party acting pursuant to that direction or requirement is immune from federal antitrust liability. In this case, the Armed Services Procurement Act provides authorization for the Air Force's direction to Williams. As the Eleventh Circuit has held, immunity attaches if "there is no substantial doubt that the [government agen-cy] required the contracts at issue in this particular case." *Greensboro Lumber Co. v. Georgia Power Co.*, 844 F.2d 1538, 1541 (11th Cir.1988).

Williams does not deny that the Air Force eventually "required" it to subcontract with Honeywell and Clark. *See* amended complaint, ¶¶ 3.7a & 3.14(i). Indeed, Williams must have taken this position in Williams' ASBCA proceedings against the Air Force, which ultimately resulted in the Air Force paying Williams an additional $365,211.75. However, at the heart of Williams' claims are two allegations which arguably bring Honeywell outside the protection of any immunity.

First, Williams alleges that the Air Force required only that Honeywell perform the five listed items in Section 13A. Thus, it was *Honeywell* (not the Air Force) that used that limited requirement to force Williams to hire Honeywell for *all* of Section 13A. Second, Williams alleges that Honeywell *coerced* the Air Force into issuing this requirement through illegal means. Thus, it was really Honeywell, not the Air Force, that forced this contractual arrangement. I discuss these in turn.

▪ *(B.) The Air Force Required Williams to let Honeywell do the Section 13A Work.* The language of Section 13A, on its face, indicates that only certain designated portions of that Section require Honeywell's participation. Except for performing the "necessary interface with the central equipment," that participation is limited to "recommendations" and "supervision." *See* doc. 194, Ex. 15 (Section 13A), esp. ¶¶ 2.1—2.1.5, 5.1, and 7. Honeywell's purported perception of its duties under the contract was broader. Based in part on what it contends was Air Force policy regarding EMCS systems, it maintained that it needed to do all the work in Section 13A.

The plaintiff presents substantial evidence that the government accepted the narrower interpretation. In a letter written to Florida's then Senator, Lawton Chiles, whose office had inquired into the contract dispute on behalf of Honeywell, Colonel Albert L. Barbero, in the office of the

Secretary of the Department of the Air Force, stated:

> With the exception of paragraph 2.1.3, Williams Electric *is free to do the work itself or to subcontract with whomever it chooses*, provided that Williams Electric or its subcontractor complies with the contractual requirement to accomplish work under the recommendations of Honeywell. The requirement in paragraph 2.1.3 that the necessary interface with Central equipment be furnished by Honeywell is to insure compatibility with the existing system and to avoid the possible unsanctioned acquisition of proprietary data ... It appears that *Honeywell's offer to Williams Electric is for some of the work that Williams would be able to perform themselves.* Honeywell seems to have included not only the supervision requirement, but also much of the actual work required. Doc. 194, Ex. 5 (emphasis added).

Similarly, Major Jerald Stubbs, Trial Attorney for the Air Force, issued a memo to Sheppard's contracting officer on August 30, 1983, which stated:

> We have reviewed Honeywell's proposal of 3 June 1983. This proposal apparently embraces all the work specified in Section 13A of the Specification, not just the more limited functions specified for Honeywell in the five subparagraphs. *This is beyond what the Government Specification requires of Williams Electric.* If Honeywell is not willing to perform anything less than the totality of Section 13A, the government may have a very difficult situation in prevailing before the Board on this appeal. *Id.,* Ex. 27, at 3, 7 (emphasis added).

Finally, the Deputy Director of Contracting, ATC Headquarters, Randolph AFB, sent a telegram to Sheppard on June 25, 1983, regarding the Williams contract. The telegram states:

> In summary, with the exception of the contractual requirement contained in Section 13A, paragraph 2.1.3 of the contract, Williams is not required to issue a subcontract to Honeywell or anyone else. *Id.,* Ex. 28.

Plaintiffs also submit the testimony of Colonel Cecil Underwood, a retired Air Force officer with over 26 years' experience in government contracting and procurement, and a purported expert in that field. After a review of the pertinent documents in this case, Underwood concluded that: (1) the contracting officer never determined that all the EMCS work was to be sole sourced; (2) under the contract, Williams was free to perform all the Section 13A work, beyond the five listed items, by itself; and (3) Williams need not have subcontracted with Honeywell for the five listed items—it could have simply performed them with Honeywell's recommendations or supervision. *Id.,* Ex. 25.]

Honeywell nonetheless insisted in its negotiations with Williams that Williams (a) subcontract with Honeywell for *all* of Section 13A, and (b) subcontract with Clark as well. There is evidence suggesting that the alternative for Williams was to breach its contract with the Air Force, which made Williams responsible for ensuring that Honeywell supervised the listed items of EMCS work.

To support its view, Honeywell presents the testimony of (1) Kenneth McNeely, the Sheppard base contracting officer, (2) Edward H. Ling, a mechanical engineer at ATC, and (3) Jerry M. Morgan, the base engineer who drafted Section 13A, all of whom say that Section 13A required Honeywell to perform or recommend (apparently at its choosing) *all* of Section 13A. *See* attachment to doc. 184, Exs. A–C. These conclusions are based in part on ATC's "Policy Letter No. 4," which instructed Air Force personnel to:

> Insure that all ... contracts for building modification or repairs that require connection or reconnections to existing EMCS be specified as sole source to the original EMCS vendor for *the connection and hardware. Id.,* Ex. E (emphasis added).

On the one hand, the testimony of all the witnesses actually involved at Sheppard support Honeywell, while Williams' witnesses are all essentially "outside" consultants. On the other hand, Williams' three

non-expert witnesses were actually involved in the contract dispute process, and most importantly, the plain language of Section 13A seems to contradict Honeywell's argument.

Ultimately, however, the Air Force's final decision on the matter was expressed in a single document. Everything else represents the review process leading up to that document.

That document is the October 7, 1983, letter from Sheppard Contracting Officer Kenneth McNeely to Williams, expressing the base contracting officer's final "determination and direction." The letter makes clear that, as far as the Air Force was concerned, Williams was required to let Honeywell perform all the listed items in Section 13A:

> You have stated that Honeywell refuses to agree to a subcontract limited to the six items specified for Honeywell in Section 13A, and that Honeywell instead insists on a subcontract encompassing most of Section 13A. *If that is the case ... then you must make such an arrangement with Honeywell....* If the only way is to subcontract with Honeywell, *then that is what you must do.* Doc. 194, plaintiff's memorandum, Ex. 41, at 3, (emphasis added).

McNeely's letter demonstrates that the Air Force would have allowed Williams to perform Section 13A work other than the "six" listed items if Honeywell had not insisted on doing all the Section 13A work itself. The issue then narrows down to who forced Williams to enter into the contractual arrangement at issue—Honeywell or the Air Force?

In answering this question, there are two possible interpretations of McNeely's letter. The first possibility is that it shows Honeywell to be responsible for forcing itself on Williams for all of Section 13A, because it exploited its monopoly on the six listed items to . expand the subcontract. Under such an interpretation, immunity would not apply.

The other possible interpretation is that the ultimate responsibility for contract construction was the Air Force's, as final arbiter. The letter shows that it adopted Honeywell's recalcitrance: "then that is what you must do." Only the Air Force had actual authority over Williams, and it knowingly used that authority to force Honeywell on Williams. Without the Air Force's enforcement power to back it up, Honeywell's hard bargaining would not have borne fruit. Thus, it cannot be denied that the Air Force required the contractual arrangement in question. Such a conclusion equates to a finding of immunity for Honeywell.

I find the second interpretation to be the only legal construction that is possible under the undisputed facts. The Air Force bears the final responsibility for bringing about the contractual arrangements at issue in this case, because the Air Force was the final arbiter of the parties' contractual dispute. The posture of the Williams–Honeywell dispute forced the Air Force to side with either one or the other, and it sided with Honeywell. By stating that, "If the only way [to obtain Honeywell's participation on the six listed items] is to subcontract with Honeywell, then that is what you *must* do," the Air Force was *directing* Williams to contract with Honeywell. As a result, "there is no substantial doubt that [the Air Force] required the contracts at issue in this particular case." *Greensboro Lumber Co., supra,* 844 F.2d at 1541.

■ *(C.) Coercion of the Air Force by Honeywell.* Williams also argues that Honeywell coerced the Air Force into making the determination that it did by threatening to withdraw its warranties on the EMCS system. Although the antitrust immunity cases discussed above do not address such conduct, I believe that such coercion, if established, would disqualify Honeywell from antitrust immunity. This argument is, in most respects, identical to the plaintiff's "who required" contention, just discussed.

Williams asserts that the conduct allegedly used by Honeywell as leverage against McNeely is conduct that is illegal under the antitrust laws.

The record does contain some evidence from which it may be inferred that Honeywell applied improper pressure on the Air Force. In a letter dated April 29, 1983, to Mary Teague at Sheppard Air Force Base Honeywell, through Geis, informed the government that if an "outside contractor" tied into the base-wide EMCS, Honeywell "can no longer be held responsible for the remaining warranty on our system." Doc. 194, Ex. 33. The letter cited concerns that the work of "outside contractors" might lead to "improper connections" and "impedance mismatches" which could "severely damage the EMCS system" and "result in system failure." *Id.* It urged Sheppard to "take whatever steps are necessary to prevent our having to take action to prevent additional liability to Honeywell." *Id.*

Several days later, citing this "danger" of voiding the warranties, Air Force Engineer George Acton issued a memo forbidding Williams personnel from working on Honeywell "DGP's," and ordering that "only Honeywell personnel will be permitted to work on the EMCS items." Doc. 194, Ex. 35, at 1.

Plaintiffs submit the testimony of Roger Haines, a purported expert in EMCS work, who expressed the opinion that Honeywell's position on its warranties was "unreasonable," and that its stated concerns about damage to its EMCS systems from the work of other contractors was "exaggerated." Doc. 194, Ex. 17, at ¶¶ 18, 22.

Honeywell reiterated its position in a September 20, 1983, letter to Teague at Sheppard Air Force Base. Responding to an inquiry from the Air Force about Honeywell's willingness to perform only the specified items within Section 13A, Honeywell conditioned such limited work on an exclusion of its "responsibility for damage to the base wide EMCS system," as well "any responsibility for a working system, or any warranty." *Id.*, Ex. 40.

The Williams–Honeywell–Air Force communications culminated in Sheppard Air Force Base Contracting Officer McNeely's final determination and direction letter, which had the appearance of remaining neutral, but had the practical effect of siding with Honeywell.

At best, this evidence might conceivably create a genuine issue of fact on whether Honeywell *attempted* to improperly influence the Air Force, but I find that there is no genuine issue on whether Honeywell's attempted "coercion" had any effect on the Air Force's decision. The United States Air Force is a major consumer of these kinds of products and services, with enormous economic "clout" in the market; certainly, much more "clout" than Honeywell. The kind of coercion allegedly practiced by Honeywell would have more serious future repercussions for Honeywell than for the Air Force. The Air Force also has extensive resources, including a large staff of knowledgeable civilian and military experts in the relevant fields. It is simply not reasonable to infer that it was being either intimidated or duped in the manner alleged by Honeywell.

As a part of the Air Force, Sheppard AFB benefits from this clout and expertise. All the evidence from the Sheppard personnel involved supports the conclusion that Honeywell had nothing to do with their decision. McNeely denies acting out of a sense of coercion. *See* doc. 184, at 18–20, 23–24. Asked at deposition about Honeywell influence on his decisions, McNeely answered, "You've got to be kidding me. No contractor tells me what to do." *Id.*, Ex. C, at 48–49. He specifically denied that Honeywell brought any "pressure" on Sheppard personnel to reach the decision announced in his October 17, 1983, determination and direction letter. *Id.* at 56.

According to McNeely, the "sole basis" for the decision was ATC Policy Letter No. 4. *Id.* at 50. Similar explanations come from the other Sheppard AFB personnel who took positions favoring Honeywell. *See* Ling dep., attachment to doc. 184, Ex. A, at 25 (Engineer Ling concluded independently that all of Section 13A should be performed by Honeywell, and was never approached by Honeywell with respect to this decision); Morgan dep., attachment to doc. 184, Ex. H, at 2 (Engineer Morgan interprets specifications as requiring Honeywell for all of Section 13A; states

that specifications "were not written because of some warranty situation on the existing system."). According to Ling, McNeely, and Morgan, although Policy Letter No. 4 was written *after* Williams and Honeywell entered into the contract in question, the letter expressed a preexisting position of the ATC office. *Id.*, Exs. A at 23–26 (Ling); B at 50–51 (Morgan); and C at 13 (Mcneely).

Taken as a whole, the evidence on this question fails to create a genuine issue of material fact. Thus, Williams' "coercion" claim is not sufficient to prevent Honeywell from invoking the recognized antitrust immunity. Accordingly, Honeywell's motion for summary judgment is GRANTED as to the federal antitrust claims, Counts I through V.

*(D.) State Antitrust Immunity.* Defendants' federal antitrust immunity is dispositive of the claims under the Florida Antitrust Act of 1980 as well (Counts VI through XIII). Section 542.20, Florida Statutes, provides that conduct exempt under the federal antitrust laws is also exempt under the Florida act. *See Falls Chase Special Taxing Dist. v. City of Tallahassee,* 788 F.2d 711, 712 n. 4 (11th Cir. 1986); *Auton v. Dade City,* 783 F.2d 1009, 1010 n. 1 (11th Cir.1986); *Sebring Utilities Comm'n v. Home Savings Assoc.,* 508 So.2d 26, 28 (Fla. 2d DCA 1987). Accordingly, defendants are entitled to summary judgment on the state antitrust claims set out in Counts VI through XIII.

## IV. LIABILITY ON NON–ANTITRUST THEORIES.

Honeywell also moves for summary judgment on all of the remaining state law claims. Each will be discussed in turn.[11]

*(A.) Tortious Interference.* Count XIV is a claim against Honeywell, Geis, Clark, and Harmon for tortious interference with a business relationship. Count XV is a claim against the same defendants for tortious interference with contractual relations. These counts allege that Honeywell tortiously interfered in the following ways: (1) refusing to provide the Air Force with warranties on its EMCS work at Sheppard AFB if the Air Force allowed Williams to perform any work on Section 13A; (2) insisting that Williams subcontract with Clark; (3) illegally tying Honeywell EMCS warranties with the purchase of Honeywell equipment and services for five items listed in Section 13A; and (4) insisting that Williams grant Honeywell a construction subcontract to perform the work of Section 13A. Doc. 172, ¶¶ 17.1–18.4.[12]

Tortious interference with a business relationship and tortious interference with contractual relations are "basically the same cause of action" under Florida law. *Smith v. Ocean State Bank,* 335 So.2d 641, 642 (Fla. 1st DCA 1976). "The only material difference appears to be that in one there is a contract and in the other there is only a business relationship." *Id.* In order to prove a tortious interference claim, the plaintiff must demonstrate (1) the existence of a business (or contractual) relationship under which the plaintiff had legal rights; (2) an intentional and unjustified interference with the relationship; and (3) damage to the plaintiff as a result of the tortious interference with that relationship. *See Ad–Vantage Telephone Directory Consultants, Inc. v. GTE Directories,* 849 F.2d 1336, 1348–1349 (11th Cir.1987) (applying Florida law).

11. Honeywell argues that a finding of antitrust immunity would compel summary judgment on the remaining state law claims as well. The cases it cites are inapposite, however. They either extend to state law claims (1) the *Noerr–Pennington* "first amendment" antitrust immunity (for petitioning the government for anticompetitive ends), or (2) the immunity of governmental *employees.* I have found no case addressing the question of whether the immunity of private parties acting at the direction of federal governmental agencies also extends to related state (non-antitrust) law claims.

12. It is clear from this list of allegations that Williams brings these tortious interference claims for more than just Honeywell's conditional refusal to subcontract for the listed Section 13A items. Therefore, Honeywell's very brief argument that a business may refuse to contract with a party for any reason sufficient *to itself cannot dispose of the tortious interfer*ence counts. *See* doc. 184, at 55 n. 88.

Honeywell argues that it is entitled to judgment as a matter of law on this claim because it was involved, as a subcontractor, in the contractual and business relationship at issue. It is true that no tortious interference action can be brought against one who is a party to the underlying contract or business relationship. A defendant seeking the shelter of this rule must be a party to "the business relationship allegedly interfered with." *Genet Co. v. Anheuser–Busch, Inc.*, 498 So.2d 683, 684 (Fla. 3d DCA 1986); *see also Rabren v. Gulf Towing Co.*, 434 So.2d 340, 341 (Fla. 2d DCA 1983); *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1224 (Fla. 3d DCA 1980), *review denied*, 392 So.2d 1371 (Fla.), *cert. denied*, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981).

The business (or contractual) relationship with which Honeywell is alleged to have interfered was Williams' relationship with the Air Force. Honeywell became an active party to this relationship or contract once it became a subcontractor for all of Section 13A. But the very tortious acts complained of are ones allegedly committed by Honeywell to force its way into the contract *as* a subcontractor. In the cases cited by Honeywell, the defendant was already a party to a contract with plaintiff when it committed the allegedly tortious acts. *See Genet, supra; Rabren v. Gulf Towing Co., Inc.*, 434 So.2d 340 (Fla. 2d DCA 1983). Thus, if Honeywell's participation arose solely as a subcontractor through the alleged tortious interference, it cannot be fairly characterized as already a party to the contract.

But prior to the allegedly tortious acts, Honeywell undeniably had a business relationship with the Air Force, stemming from its initial EMCS installation and agreements regarding its maintenance. Moreover, Honeywell was expressly incorporated into Williams' contract with the Air Force in Section 13A. Section 13A undeniably required some level of participation by Honeywell, i.e., "recommendations" and "supervision" on the listed items in that

section. Accordingly, it was a party to both the contractual and business relationship in question. Honeywell's motion is GRANTED with respect to the tortious interference claims in Counts XIV and XV.

*(B.) Common Law Fraud.* Counts XVI and XVII are claims of Florida common law fraud. Count XVI alleges that Honeywell (1) misrepresented its cost of labor, (2) charged Williams for work that was performed at other jobs; (3) falsely represented that it would provide certain material and work under Section 13A; (4) falsely represented that Sheppard's base-wide EMCS system was operational; (5) stated that it was installing new equipment at the switching station when it in fact reused equipment already on site; (6) charged Williams for materials that Honeywell had been paid to provide under its 1976 contract with the government; and (7) falsely represented that information and materials sought by Williams was confidential and proprietary.[13] Count XVII alleges that Honeywell, along with Clark, falsely represented to the Air Force that the cost of the work they were performing under Section 13A was approximately $410,000, when their own internal records showed that the cost was under $50,000.

Although the parties have not done so, it is important to distinguish between the two types of fraudulent acts alleged here. First, Williams alleges that Honeywell charged Williams for things it never provided Williams. This constitutes fraud during the course of the performance of the contract. Second, Williams alleges that Honeywell fraudulently induced the Air Force to require Williams to subcontract with Honeywell and Clark, at a price considered outrageous by Williams. Count XVI alleges both types of fraud; allegation (7) relates to inducement, while allegations (1) through (6) relate to performance. Count XVII contains only inducement allegations.

---

**13.** *See* amended complaint, doc. 172, ¶ 19.3(d) (allegation (7)); ¶ 19.3(c)-(d) (all other allega-tions).

The elements of fraud in Florida are: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) reliance on the representation to the injury of the other party. *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985); *Barroso v. Respiratory Care Servs.*, 518 So.2d 373, 376 (Fla. 5th DCA 1987) (cited by Honeywell).

1. *Florida's "Economic Loss" Rule.* Though the parties have not raised the issue, I think the "economic loss" rule described in *AFM Corp. v. Southern Bell Telephone & Telegraph Co.*, 515 So.2d 180 (Fla.1987), and *Florida Power & Light Co. v. Westinghouse Elect. Corp.*, 510 So.2d 899 (Fla.1987), merits discussion with regard to these fraud claims. In *AFM Corp.*, *supra*, the Court held that without evidence of personal injury or property damage, a purchaser of services cannot raise negligence tort claims flowing from a breach of contract to recover solely economic damages. Although *AFM Corp.* and *Florida Power & Light* involved negligence claims in a contract context, two more recent cases suggest that the economic loss rule also applies to fraud claims. *See Interstate Securities Corp. v. Hayes Corp.*, 920 F.2d 769, 775–777 (11th Cir. 1991); *J. Batten Corp. v. Oakridge Inv. 85*, 546 So.2d 68 (Fla. 5th DCA 1989).

*J. Batten Corp.*, *supra*, is factually analogous to the circumstances here. In that case, a general contractor sued the property owner in a construction project under a mechanic's lien and asserted additional claims for breach of contract and fraud. The mechanic's lien claim simply alleged that the owner still owed the contractor money on the project. *Id.* at 69. The fraud claim alleged that the owner had refused to pay for certain work, and then induced the contractor to complete construction based on the owner's fraudulent representation that it would pay the amount due. *Id.* The trial court dismissed the contractor's fraud claims. Florida's Fifth District Court of Appeal affirmed, citing *AFM Corp.*, *supra; Lewis v. Gu-*

*thartz*, 428 So.2d 222 (Fla.1982); and *John Brown Automation, Inc. v. Nobles*, 537 So.2d 614 (Fla. 2d DCA 1988).

*J. Batten Corp.* suggests that the economic loss rule applies in this case. However, the Court in *AFM Corp.* reaffirmed the rule in *Lewis v. Guthartz*, *supra*, that recovery in tort is nonetheless possible in a contract context if the plaintiff proves that a tort "distinguishable from or independent of the breach of contract" was committed:

> A breach of contract, alone, cannot constitute a cause of action in tort ... It is only when the breach of contract is attended by some *additional conduct* which amounts to some independent tort that such breach can constitute negligence.

*AFM Corp.*, *supra*, 515 So.2d at 181 (emphasis added), *quoting Electronic Security Systems Corp. v. Southern Bell Telephone and Telegraph Co.*, 482 So.2d 518 (Fla. 3d DCA 1986).

*Interstate Securities Corp. v. Hayes Corp.*, *supra*, is the most recent Eleventh Circuit application of the Florida's economic loss rule. Interpreting Florida law in that case, the court suggested that Florida law may bar all fraud claims where the plaintiff has a contract remedy. 920 F.2d at 776–777, *citing J. Batten Corp. v. Oakridge Inv.*, *supra*. Applying similar analysis to the tort of breach of fiduciary duty, but suggesting the rule would not apply to the tort of defamation, *id.* at 776 n. 11, the court appeared to analyze the "independent tort" exception on a tort-by-tort basis.

However, I conclude that *Interstate Securities Corp.*, which involved fraud in the performance of a contract, is distinct from the fraud in the inducement claim in this case. The distinction is critical, for the essence of the "economic loss" rule is that contract law and tort law are separate and distinct, and the courts should maintain that separation in the allowable remedies. There is a danger that tort remedies could simply engulf the contractual remedies and thereby undermine the reliability of commercial transactions. Once the contract has been made, the parties should be governed by it.

Fraud in the inducement, however, addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort.[14]

In the Florida "economic loss" rule cases dealing with fraud, either the conduct of the defendant is "inextricable from the events constituting a breach of contract,"[15] or tort damages are not separate from the contract damages.[16] Typically, alternative fraud claims are precluded.[17]

Significantly, though, at least one Florida appellate court has emphasized that the misrepresentation involved must be "associated with the *performance* of the contract" to be within the economic loss rule. *John Brown Automation, Inc. v. Nobles,* 537 So.2d 614, 618 (Fla. 2d DCA 1988) (emphasis in original).

Although I view the Florida law in this area as not entirely clear, I conclude that "economic loss" rule bars a fraud recovery with respect to the claims of fraud in the performance. Here, Williams claims that Honeywell failed to disclose these fraudulent billings, falsified records, etc., thereby covering up its breach. This is fraud in the performance, and is barred by the economic loss rule. Williams "inducement" claims,

however, are not subject to summary judgment on this ground.

■ *2. The Element of Reliance.* With regard to the fraud claims and notwithstanding the "economic loss" rule, Honeywell also correctly notes that Williams entered the contract under protest, disputing the representations made by Honeywell to induce the Air Force to require Honeywell's participation in the contract. Therefore, argues Honeywell, Williams could not have relied on Honeywell's alleged misrepresentations.

Williams contends, however, that Honeywell knowingly made material misrepresentations which induced the Air Force to require Williams to act to Williams' detriment. According to Williams, the fact that the party relying on the misrepresentation (the Air Force) and the party suffering damage as a result (Williams) are distinct parties should not be fatal.

I have found no Florida case law directly on point. The various enumerations of the elements of fraud found in the Florida cases generally employ wording which suggests that there must be reliance by the plaintiff.

The only Florida case cited by Williams, *Joseph v. Norman La Porte Realty, Inc.,* 508 So.2d 496 (Fla. 3d DCA 1987), is dis-

---

**14.** See *Burton v. Linotype Co.,* 556 So.2d 1126, 1128 (Fla.3d DCA 1989) ("Fraud in the inducement and deceit are independent torts for which compensatory and punitive damages may be recovered"), *citing Sprayberry v. Sheffield Auto & Truck Serv., Inc.,* 422 So.2d 1073 (Fla.1st DCA 1982) ("[O]ne who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud"); *accord, Gold v. Wolkowitz,* 430 So.2d 556, 557 (Fla.3d DCA 1983), *review denied,* 437 So.2d 677 (Fla.1983); *see also Wallis v. South Florida Savings Bank,* 574 So.2d 1108, 1110 (Fla.2d DCA 1991) (recognizing fraud in the inducement claims independent of contract claims, without discussion of economic loss rule); *Lou Brachrodt Chevrolet, Inc. v. Savage,* 570 So.2d 306, 308 (Fla.4th DCA 1990) (same); *Yanks v. Burnett,* 563 So.2d 776, 777 (Fla.3d DCA 1990) (same).

**15.** *See, e.g., John Brown Automation, Inc. v. Nobles,* 537 So.2d 614, 617–618 (Fla.2d DCA 1988).

**16.** *See, e.g., Rolls v. Bliss & Nyitray, Inc.,* 408 So.2d 229, 237 (Fla.3d DCA 1981).

**17.** See *Lake Placid Holding Co. v. Paparone,* 508 So.2d 372, 376 (Fla.2d DCA 1987) (conspiracy by defendants to defraud broker out of her commission; fraud and breach of fiduciary duty claims arose from same conduct constituting breach of brokerage commission contract); *Merril Lynch v. Anderson,* 501 So.2d 635, 638 (Fla. 1st DCA 1987) (conspiracy by defendant broker to cover up its failure to timely execute plaintiff's sell order, and to "foist" resulting loss on plaintiff; no tortious conduct alleged independent of conduct constituting breach of parties' agreement); *and Taylor v. Kenco Chem. & Mfg. Corp.,* 465 So.2d 581, 588–590 (Fla.1st DCA 1985) (defendant diverted business income to avoid prepayment provision of promissory-note; fraud arose from same conduct which constituted the breach of contract). *But see Warren v. Monahan Beaches Jewelry Center, Inc.,* 548 So.2d 870, 873 (Fla.1st DCA 1989) (seller's post-sale concealment that diamond ring was fake constituted subsequent tort of fraud independent of contractual breach).

tinct. In *Joseph,* the defendant, an agent of a realty broker, made misrepresentations to a swimming pool inspection company hired by the buyers. The inspection company erroneously reported that the pool was free from defects, a fact on which the buyers relied to their detriment. The court reversed the dismissal of the buyers' fraud claim against the defendant, because the plaintiffs had relied on the inspection company's misrepresentation, which in turn had relied on the defendant's misrepresentation. *Id.* at 497. The plaintiffs, therefore, "relied *through their agent* on ... misrepresentations." *Id.*87072679 (emphasis added). Obviously, that is not the situation here.

Plaintiff also relies upon a Georgia case, *Florida Rock & Tank Lines, Inc. v. Moore,* 258 Ga. 106, 365 S.E.2d 836, 837 (1988). There, the defendant had lied to Exxon about his intent to pay for some gasoline, causing Exxon to instruct the plaintiff to deliver the gasoline to the defendant. The plaintiff was allowed to directly sue the defendant for fraud.

Specifically addressing the "familiar precept that actual fraud must be based upon a misrepresentation made *to* the actual defrauded party, and relied upon *by* the defrauded party," the Georgia court held that misrepresentations made to a third party with the ultimate intent of causing the plaintiff harm satisfied the reliance element and stated a claim for fraud. *Florida Rock & Tank Lines, Inc. v. Moore, supra,* 365 S.E.2d at 837. Under Florida's "economic loss" rule, the facts of this case seem to support only a contract claim for payment of the gasoline, and, therefore, would not support a tort claim for fraud. Even if a tort claim is appropriate however, it seems to me that this case is also an "agency" theory case, like *Joseph.* The plaintiff was deceived by the defendant through the defendant's misrepresentations to Exxon, which was an agent of the plaintiff's. In both of these cases, the four elements of fraud were met and the plaintiff was deceived into action. That is not the situation here.

Honeywell relies also upon *Barroso v. Respiratory Care Services, Inc.,* 518 So.2d 373 (Fla. 5th DCA 1987). In *Barroso,* misrepresentations made to a hospital by the defendant resulted in higher costs in a contract between the hospital and the plaintiff. The court reversed a jury verdict for the plaintiff, stating that "the asserted 'fraud' was not directed against [plaintiff]; rather it was directed against [the hospital] and the public, who are not complaining." *Id.* at 377. This case is arguably distinct. Since the plaintiff in that case was a *participant* in the overall fraud, the fraud could not possibly have been directed against the plaintiff. Immediately after the language quoted above, the court notes this fact, concluding that "[t]his is a case of the pot suing the kettle for being black." *Id.* It is not necessary for me to rely upon *Barroso,* however, for the law in Florida seems to fully support a requirement that the plaintiff must have relied upon the misrepresentation, as the defendants contend.

I conclude that a plaintiff must have relied on a defendant's misrepresentations and must have been deceived by them in order to maintain a Florida fraud cause of action. Therefore, the fraud in the inducement claim of Count XVII, and the similar claim outlined in subparagraph (d) of Count XVI, are insufficient under Florida law. Since the remainder of Count XVI is barred by the Florida economic loss rule, the net result is the elimination of both fraud counts. Accordingly, Honeywell's motion for summary judgment is GRANTED as to Counts XVI and XVII.

(*C.*) *Civil Conspiracy.* Count XVIII alleges a claim for civil conspiracy, presumably under Florida common law, against Honeywell, Clark, Geis and Harmon. In Florida, actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor. *See, e.g., Churruca v. Miami Jai–Alai, Inc.,* 353 So.2d 547, 550 (Fla.1977); *Dozier & Gay Pain Co., Inc. v. Dilley,* 518 So.2d 946 (Fla. 1st DCA 1988); *American Diversified Ins. Servs., Inc. v. Union Fi-*

*delity Life Ins. Co.,* 439 So.2d 904 (Fla. 2d DCA 1983). Although I have found no case stating this point exactly, logic decrees that the independent wrong or tort should be a *Florida* tort. As previously discussed, there is no independent valid cause of action for a single actor under Florida law. Instead, plaintiff seeks to claim a conspiracy based upon an alleged violation of a Texas statute. To bring a Florida law civil conspiracy claim which is derivative of a Texas statutory civil claim would require the application of the law of two different states to the same alleged tortious conduct. Thus, if Count XVIII alleges a Florida law cause of action, it must be dismissed.

Although the amended complaint does not title Count XVIII as a Florida law claim, I conclude that it is. The plaintiff's own memorandum acknowledges that the conspiracy claim arises under Florida law. *See* doc. 194, at 161–164. Further, in paragraph 21.7 of the complaint, the plaintiff's factual allegations are of conduct that occurred in Florida. Accordingly, defendant's motion is GRANTED with respect to Count XVIII.

*(D.) Texas Deceptive Trade Practices Act.* Finally, Counts XIX and XX assert claims under the Texas Deceptive Trade Practices Act (DTPA), Tex.Bus. & Comm. Code § 17.505(a) (Vernon 1988). Among other things, this Act provides "relief for consumers" by providing a right of action for "deceptive trade practices" by a seller. *Id.* at § 17.50(a)(3). "Deceptive trade practices" are defined by Section 17.46(b), which identifies over 20 separate deceptive trade practices. Section 17.50(b)(1) gives consumers a right to actual damages and provides for treble damages against a seller whose acts are "committed knowingly."

Honeywell argues that Williams has failed to furnish sufficient notice as required under the Act. The DTPA provides that, "[a]s *a prerequisite to filing a suit* seeking damages ... a consumer shall give written notice to the person at least 30 days before filing the suit ...". *Id.* at § 17.50A(a) (emphasis added). Williams' original complaint did not contain a claim under the Act. Williams first alleged such

a claim in its amended complaint filed March 28, 1989. Formal notice was provided defendants on January 6, 1989, over 30 days prior to adding the claim.

Honeywell cites *Boyd Int'l, Ltd. v. Honeywell, Inc.,* 837 F.2d 1312 (5th Cir. 1988) in support of its argument that Count IX should be dismissed. In *Boyd,* the original complaint contained a DTPA claim, but formal notice was not sent until six days after the original complaint was filed. More than thirty days after notice was sent, plaintiff filed an amended complaint asserting a new theory under the Act. *Id.* at 1313. The Fifth Circuit agreed with Honeywell that the notice provided was insufficient, and reversed an award based on the amended DTPA claim. *But see Minor v. Aland,* 775 S.W.2d 744 (Tex.App. 1989).

■ However, a preliminary issue is whether this court has jurisdiction over a Texas statutory claim in this case. Williams' assertion of causes of action under Florida law seemingly have made Florida law applicable. To raise a Texas law claim for essentially the same underlying conduct seems implausible. Now that I have determined that there are no viable Florida law claims in the case, the inappropriateness of trying a Texas law claim in a Florida diversity action also seems apparent. Therefore, the claims of plaintiff under the DTPA are DISMISSED, without prejudice.

## V. CONCLUSION

For the reasons stated above, Honeywell's motion for summary judgment is GRANTED as to all claims except those under the Texas Deceptive Trade Practices Act, and judgment shall be entered accordingly, with taxable costs against the plaintiff. Counts XIX and XX are DISMISSED, without prejudice.

DONE AND ORDERED.