LEISURE FOUNDERS, INC. and Kenneth V. Knight, Plaintiffs,

v.

CUC INTERNATIONAL, INC.; E. Kirk Shelton; and Stuart Bell, Defendants.

No. 92–2879–Civ.

United States District Court, S.D. Florida.

Aug. 31, 1993.

Barton S. Sacher, Hornsby, Sacher, Zelman & Stanton, P.A., Miami, FL, for plaintiffs.

Bruce Berman, Weil, Gotshal & Manges, Miami, FL, for defendants.

### ORDER

MARCUS, District Judge.

THIS CAUSE comes before the Court upon Defendants' motion to dismiss and motion to stay proceedings pending resolution of a parallel action in state court for rescission of contract filed by Defendants. (D.E. 19). The Verified Complaint alleges claims for breach of contract, fraud, civil theft (Fla. Stat. §§ 812.014 and 772.11), conspiracy to commit fraud and civil theft, violations of Florida Securities and Investor Protection Act (Fla.Stat. § 517.211), violations of § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b) and S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5, a derivative claim for controlling person liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and a claim for injunctive relief.

Defendants move to dismiss each of these claims (with the exception of the claims for breach of contract and injunctive relief) for failure to state a claim upon which relief can be granted. Because we find that the federal claims (and the parallel Florida securities law claim) do state a cause of action for fraud "in connection with the purchase or sale of a security," and because Plaintiff has articulated a colorable claim for fraudulent inducement which is not barred by Florida's economic loss rule, Defendants' motion to dismiss must be DENIED IN PART. However, because Florida's civil theft statute only provides relief where the claim is independent of the contractual relationship, and because Plaintiffs have failed to plead a conspiracy to commit fraud with the requisite particularity, Defendants' motion to dismiss must be GRANTED IN PART.

The Verified Complaint alleges that Plaintiffs Leisure Founders, Inc. ("Leisure") and its principal Kenneth Knight entered into a contract on or about October 15, 1992 with Defendant CUC International, Inc. ("CUC"), through its agents Defendants E. Kirk Shelton and Stuart Bell to introduce CUC to a company called Leaguestar plc ("Leaguestar"), which CUC sought to acquire. Knight owned 337,005 shares (or approx. 4.9%) of Leaguestar, which holdings—according to Plaintiffs' account—made him the "swing" or controlling shareholder, since the remaining common stock was held by two rival groups, the insiders (48.9%) and the institutional investors (46.2%), neither of whom held a majority of shares.

In return for this introduction and facilitation of negotiations, the following consideration was to be provided:

(a) Leisure was to be compensated approximately $1 million (adjusted up or down depending on the closing price of the deal) as a commission,

(b) plus $100,000 in "unaccountable expenses."

In addition, the contract provided that Knight would be offered

(c) a consulting position with Leaguestar after its acquisition at a salary of $250K per year; and

(d) 30,000 options to acquire Leaguestar stock at the closing price of the deal (which was $27 7/8); and 17% of any increases in EBIT (Earnings Before Interest Expense and Taxes) over the next two years.

This compensation was over and above what Knight would receive for the sale of his block of shares (about $9.5 million). Further, the compensation was, by the terms of the contract, not dependent on any particular level of services rendered by Knight and Leisure as the contract recited that any closing on the deal would evidence sufficient consideration. The total value of the package was in excess of $5 million. Plaintiffs maintain that the sole purpose of the contract was to induce Knight to sell his shares and to cause the other shareholders thus to follow suit.

Leaguestar was acquired by CUC on December 11, 1992 through a purchase of 100% of its stock for $70 million cash, apparently after Knight's arranging of meetings and other efforts, after a prior cash plus stock offer was rejected. According to the Complaint, on December 15, 1992 CUC informed Knight and Leisure that it would not compensate them for items (a)–(d) above, but would instead pay "less than a fourth" of the value of that compensation package. Defendants filed an action for rescission in state court (which Plaintiffs removed and which was subsequently remanded), and later, Plaintiffs filed this action.

## I. *Motion to Dismiss Counts II, III and IV for Securities Fraud Violations*

■ The central issue presented by the motion is whether the complaint states a claim for violation of section 10(b) of the Securities and Exchange Act and S.E.C. Rule 10(b)–5. To state a claim under § 10(b) and Rule 10(b)–5, the complaint must allege material misstatements or omissions indicating an intent to deceive or defraud "in connection with the purchase or sale of any security." *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5; *Superintendent of Ins. of New York v. Bankers Life and Casualty Co.,* 404 U.S. 6, 12 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Because the alleged fraud in failing to perform a contract with Plaintiffs does "touch" the sale of securities, *see Superintendent of Insurance of New York,* 404 U.S. at 12–13, 92 S.Ct. at 169, the motion to dismiss the federal securities claims and the Florida securities claim[1] must be denied.

Plaintiffs argue that the nexus requirement for a 10(b)–5 claim is fulfilled since Knight would not have sold his shares without the inducement of the side-deal where he allegedly served as facilitator of the takeover of Leaguestar by CUC, and then as advisor to the acquired company, in exchange for cash and stock options. Since the side-deal consideration was fraudulently offered, Plaintiffs argue, a fraud "in connection with" the purchase or sale of securities was committed.

Defendants, on the other hand, urge us to follow the narrower rule of construction of the "in connection" requirement articulated by several courts, which suggests that the requirement "mandates that the alleged fraud concern the fundamental *nature* of securities; namely the characteristics and attributes that would induce an investor to buy or sell the particular securities." *Citibank, N.A. v. K–H Corp.,* 745 F.Supp. 899, 903 (S.D.N.Y.1990) (emphasis added); *see also, Abrash v. Fox,* 805 F.Supp. 206 (S.D.N.Y. 1992) ("[E]ven when there is a clear causal connection between the misrepresentations and the investment decision, there is no securities law violation unless the misrepresentations or omissions involved in a securities transaction pertain to the securities themselves."). To this end, Defendants argue that although the fraud is alleged to have proximately caused the sale, it did not concern the *nature* or *value* of the securities themselves, and therefore would not satisfy the "in connection with" requirement as interpreted by the cases narrowly construing that phrase.

The problem with the Defendants' position is threefold: in the first place, the Defendants' narrow reading of the "in connection with" requirement cannot be easily reconciled with the broad construction of the nexus requirement as enunciated by the United States Supreme Court in *Superintendent of Ins. of New York v. Bankers Life and Casualty Co., supra.* In the second place, the narrow reading cannot be reconciled with the broad and unqualified phrase, "in connection with," employed by Congress in the statute itself. In the third place, this case cannot be fairly distinguished from those which Plaintiffs argue stand for a broad construction of the requirement. *See e.g., S.E.C. v. Drysdale Securities, Inc.,* 785 F.2d 38, 42 (2d Cir.1986), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986); *A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir.1967). And finally, the cases cited by the Defendant for support arise in a meaningfully different fac-

---

**1.** The parties agree that the disposition of the federal securities claims on this motion would govern the disposition of Count III (since section 20(a) liability is derivative of section 10(b)–5) and Count IV (for Florida securities law violations, as the relevant Florida statutes track their federal counterparts). *See* Defendants' Reply Memorandum at 6 n. 4.

tual matrix from that presented here. *See e.g., Hunt v. Robinson,* 852 F.2d 786, 787 (4th Cir.1988); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930 (2d Cir.1984), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *R.H. Damon & Co. v. Softkey Software Products, Inc.,* 811 F.Supp. 986 (S.D.N.Y.1993); *Abrash v. Fox, supra; Citibank, N.A. v. K–H Corp., supra.*

The Supreme Court, in *Superintendent of Insurance of New York v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), held that a section 10(b) claim was stated where an insurance company was tricked by controlling shareholders into selling treasury bonds for a certificate of deposit which was never delivered. The defendant-shareholders were alleged to have previously purchased 100% of the insurance company's stock with the assets of the same insurance company by essentially "kiting" a $5,000,000 check from a bank at which the shareholders had no funds on deposit. They then caused the same bank to issue another check in the same amount with which they purchased a certificate of deposit issued to the insurance company. The certificate of deposit was never delivered to the insurance company, and instead was negotiated as collateral for a loan to cover the second check. Although the insurance company's investment assets had been entirely depleted, its books reflected only the sale of the treasury bonds and the purchase of the certificate of deposit. The Supreme Court, in finding that a claim for violation of section 10(b) was stated, made the broad pronouncement that

> [s]ince there was a "sale" of a security and since fraud was used "in connection with" it, there is redress under § 10(b), whatever might be available as a remedy under state law.

*Superintendent of Insurance,* 404 U.S. at 12, 92 S.Ct. at 169.

For the purposes of this motion, we must accept Plaintiffs' theory that part of the consideration to induce Knight to sell his stock, in addition to cash, was the promise of several forms of compensation, including a consulting position with Leaguestar and 30,000 stock options. Thus, this case presents more than a claim for fraudulent non-payment of a brokerage commission; rather, the complaint alleges that the defendants enticed Knight to disgorge his stock by means of a fraudulent scheme. As such, the facts as pled cannot be meaningfully distinguished from those in *Superintendent of Insurance,* where, *even though absolutely no misrepresentation was made as to the value of the bonds,* the mere allegation that "the seller was duped into believing that it, the seller, would receive the proceeds," was sufficient to state a claim for fraud under § 10(b). *Id.* at 8, 92 S.Ct. at 167. No manipulation or misrepresentation of the value of the Leaguestar shares is here alleged, rather, Plaintiffs contend only that Defendants fraudulently intended to withhold payment of part of the consideration for the Leaguestar stock. The allegation that "[Plaintiff] was injured as an investor through a deceptive device which deprived it of any compensation for the sale of its valuable block of securities," is sufficient, according to the Supreme Court, to state a § 10(b) claim. *Id.* at 10, 92 S.Ct. at 168. (The fact that *some* of the compensation was delivered here is a distinction without meaningful difference.)

To this end, the comments of Judge Friendly bear repetition:

> If one asks why a court should recognize a federal claim when new owners loot a company of $5,000,000 of Treasury bonds, as in *Superintendent of Insurance,* but not if they steal the same value in gold bars, the answer—apart from the one, sufficient for an inferior federal court, that the Supreme Court has so decided—must be that, when Congress has legislated comprehensively with respect to securities frauds, there will inevitably be a borderland where the policy for federal regulation is less clear than at the central core, and there will also be a difficulty in seeing what sound purpose is served by having the statute or rule apply when the fraud lies in the misappropriation of a corporation's securities but not of other property. A line must be drawn somewhere, and the Supreme Court, as we read its opinion, has pushed the perimeters rather far when securities are involved.

*ITT v. Vencap, Ltd.,* 519 F.2d 1001, 1014 n. 26 (2d Cir.1975).

Because the language of the statute itself is facially broad and unfettered, because the Supreme Court has indeed "pushed the perimeters" of the statute "rather far," and because we cannot fairly distinguish the Leaguestar transaction from that under scrutiny in *Superintendent of Insurance*, we must deny the motion to dismiss the claims for securities laws violations. As there is no controlling precedent in the Eleventh Circuit on this question, to further inform our decision we turn primarily to the authority from courts within the Second Circuit, which have had greater occasion to confront the relevant issues. The cases are somewhat checkered, but in the main, they support Plaintiffs' position.

In *A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir.1967), the Second Circuit held that a claim under section 10(b) was stated by the plaintiff's allegation of defendant's scheme of placing purchase orders with various stock brokers and dealers to purchase securities with the fraudulent intent of paying for the securities only if their market value had increased by the date payment was due. Thus, like the case at bar, there was no misrepresentation of the value of the securities, yet the court still found a violation. The Court stated that

> Neither § 10(b) nor Rule 10b–5 contains any language which would indicate that those provisions were intended to deal only with fraud as to the "investment value" of securities, and, indeed, it is established that a 10b–5 action will survive even though the fraudulent scheme or device is unrelated to "investment value."

*Id.* at 396–97 (citations omitted).

 In *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.1984) (Friendly, J.), the Second Circuit dismissed a 10(b) claim based on the default of a loan to a parent corporation where the subsidiary's stock was pledged as collateral. Judge Friendly commented that

> [t]he purpose of § 10(b) and Rule 10–b(5) is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Chemical Bank*, 726 F.2d at 943. The Court found that "it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part." *Id.* at 943. The actual holding of the case dismissed the 10(b) claim reasoning that the "in connection with" requirement could not be satisfied simply on the basis of the fortuity that the collateral for a bank loan happened to be securities. The case at bar is distinguishable from the *Chemical Bank* result, because the Leaguestar stock played the most integral part of the bargain, in contrast to the securities merely pledged as collateral for a loan in *Chemical Bank*. In this case, the guts of the deal as alleged was for the Defendant to obtain a controlling interest in Leaguestar by acquiring the stock of Leaguestar, in exchange for cash and the compensation package. Tracking Judge Friendly's formulation of the purpose of § 10(b), the plaintiffs in this case have alleged that some of the consideration—the four-prong compensation package—was "not what it purport[ed] to be" since Defendants intended not to deliver on it. Consequently, a § 10(b) claim is properly stated consonant with the purpose of that section as elucidated by *Chemical Bank*.

 One district court has interpreted "the teaching of *Chemical Bank*, as articulated by Judge Friendly and interpreted in later cases, [to be] that the 'in connection with' requirement of Section 10(b) will not be satisfied unless the misrepresentation is related to the nature or value of the securities pledged as collateral." *See Citibank v. K–H Corp.*, 745 F.Supp. at 904. We observe first, however, that Judge Friendly also articulated the *purpose* of § 10(b) to be protecting the securities seller from the schemes of perfidious buyers. Second, it would be incongruous to extend this "going to the nature or value of the securities" theory of the nexus requirement to the fact scenario at bar where the misrepresentations were allegedly made by the buyer, as this would produce the anomalous result of finding section 10(b) applicable only for fraudulent misrepresenta-

tions by the seller, but not by the buyer. *Cf. Abrash v. Fox*, 805 F.Supp. at 208 (finding no § 10(b) claim where misrepresentation by *seller* did not "pertain to the securities themselves"). At all events, the language of the statute itself in no way limits the "in connection with" requirement to frauds "going to the nature or value of the securities." If Congress had wished to impose such a limitation, one could have been easily written into the statute.

The case of *S.E.C. v. Drysdale, supra*, held that the "in connection with" requirement was satisfied where defendants, traders in "repos" and "reverse repos" had allegedly misrepresented their financial condition to banks and securities dealers. The defendants in *Drysdale* engaged in sale and repurchase agreements ("repos") involving the sale of securities for cash, subject to an agreement to repurchase them later at a fixed price. ("Reverse repos" involve the purchase of securities subject to an agreement to resell them to the other party at a fixed price at a later date.) The trial court dismissed the 10(b) claim under the authority of *Chemical Bank*, on the reasoning that there was no difference between a repo and a collateralized loan, since essentially, the repo dealer was borrowing money and pledging securities as collateral, and then agreeing to repay the loan with "interest" by repurchasing the securities at a fixed higher price. The Court of Appeals for the Second Circuit reversed, finding that the misrepresentation of the health of the defendant-securities dealer affected the value received by the other party. The Court reasoned that the insolvency of the defendant reduced its ability to make good on its promise to buy back the securities at a later date, since its ability to do so was "more dependent upon the appreciation of the underlying securities than it would have been had it been financially healthy." *Drysdale*, 785 F.2d at 42. In a reverse repo, securities dealers usually immediately sell the securities received for cash (or in another repo). Thus, in order to resell the securities upon the settlement date in a reverse repo, the defendant had to be able to purchase identical securities before the settlement date so it could deliver them back to the other party. The Court surmised that the defendant's insolvency "may have rendered this impossible." *Id.*

The deciding factor for the Court of Appeals which distinguished *Drysdale* (repos) from *Chemical Bank* (collateralized loans), was that in a collateralized loan, the lender merely holds the pledged collateral for security and may not sell it without a default. In a repo, however, the "lender" takes *title* to the securities received, and can sell or pledge them. Thus, the repo transaction is best characterized as a *securities trade* rather than a collateralized loan, and would more properly come within the ambit of the federal securities law. Similarly, in the case at bar, Plaintiffs allege that Defendants failed to perform their end of the *securities trade*. Unlike *Chemical Bank*, this case does not involve a loan, but rather a transaction "where the securities were transferred as a direct result of a misrepresentation." *Id.*

Further, the *Drysdale* Court did not focus at all on whether the *value* of the securities themselves was overstated, but rather found it significant that the "misrepresentation clearly pertained to a significant part of the consideration offered," and that the allegedly fraudulent warranty as to the solvency of the defendants "was essential to the value received by the other party in a securities transaction." *Id.* at 42. Like the case at bar, the fraudulent representation aimed at the consideration only, and the Second Circuit in *Drysdale* found that to be enough to state a section 10(b) claim.

In *Kearney v. Prudential–Bache Securities, Inc.*, 701 F.Supp. 416 (S.D.N.Y.1988), which Defendants cite as contrary authority, the District Court addressed the parallel "in connection" provision of the Commodities Exchange Act, and offered the following analysis:

[L]oss causation is basically a tort concept of proximate cause—whether the misrepresentation induced the loss, and therefore can be proved by a showing that is different from what is necessary to prove fraud "in connection with" a transaction. As a practical matter, however, the "in connection with" test shares with loss causation the requirement that the fraud alleged be

closely enough linked to the commodities transaction that an observer could conclude that the fraud caused the transaction. *However, the "in connection with" test goes further and demands more than just mere proximity: the fraud must concern the very nature or characteristic of the securities or commodities at issue.* *Kearney,* 701 F.Supp. at 425 n. 10 (emphasis added). In that case, summary judgment was granted against plaintiff, who alleged that her commodities broker had fraudulently misrepresented the tax status of her commodities futures accounts. Specifically, the broker allegedly advised her that she need not close out her losing commodities positions in order to realize a tax loss, and that she should sell stocks on which she had realized a gain in order to offset the commodities losses. Since no loss on commodities positions is realized until the position is closed out, the plaintiff could not offset her stock gains and became liable for substantial taxes. The court distinguished between fraudulent advice about the taxability of the securities themselves (which would have satisfied the "in connection with" requirement), and advice about the *mechanics* of realizing a loss on an admittedly taxable security (which the court held was not actionable under the Commodities Act). *See id.* at 427. As noted above, however, this "going to the nature or value of the securities" approach to the nexus requirement is inapposite here, since its literal application would appear to permit a section 10(b) remedy when the fraud was committed by the seller, but bar the remedy where the fraud was committed by the buyer.

More on point is the guidance provided in *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir. 1986), that "making a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate Section 10(b) where the promise is part of the consideration for the transfer of securities." In *Luce,* general partners solicited the sale of limited partnership interests to provide capital for a residential renovation venture in lower Manhattan. Among other things, the general partners promised that the funds from the sale of the limited partnership interests would be used to repay the partnership's outstanding debts, and warranted that construction would be completed and condominium units sold within a year. Instead, the partnership debts were not repaid, the capital raised was used to borrow still more funds, and three and one-half years later, the building was allegedly a "gutted shambles"; further, the defendants allegedly knew that variances for residential zoning had been denied prior to the offering. Certainly the misrepresentations in *Luce* can be readily distinguished from those here, in that they went to the value of the securities themselves, and were made by the sellers. But the barebones contention in *Luce,* as here, is that a securities transaction would not have been consummated but for a promise to provide consideration (be it in the form of adding value to a partnership investment, or paying a sum of money) which the promisor allegedly never intended to perform.

The Court of Appeals for the Fourth Circuit, articulating the narrow construction of the "in connection with" requirement, has also suggested that "misrepresentation of the value of the stock which was to be conveyed" is a necessary requirement in a Rule 10–b(5) fraud claim. *See Hunt v. Robinson,* 852 F.2d at 787. In that case, the plaintiff was promised 22% of stock in a proposed company when it was formed in return for plaintiff's accepting employment with the company. The plaintiff was subsequently fired, and sued for the failure of the company to deliver the stock. The Court of Appeals reasoned that "[t]he alleged fraud lies, not in the actual sale of the stock, but rather in defendants' refusal to tender the shares as required by the terms of the contract," *id.,* and dismissed the § 10(b) claim. The Court distinguished *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555 (2d Cir.1985), which permitted a § 10(b) claim to be pled where the plaintiff alleged that the defendant corporation has fraudulently misrepresented the financial condition of the company to induce the plaintiff to enter into an employment contract and transfer certain assets to the company in return for the right to receive shares of stock. Thus, in *Yoder,* the alleged

deception ran directly to the value of the stock.

The Fourth Circuit further explained:

Plaintiff's complaint raises grievances redressable by state law. Seven of plaintiff's eight causes of action—for example, breach of contract, common law fraud, civil conspiracy, breach of fiduciary duty, conversion and unfair trade practices—are claims cognizable under state law. Fraudulent nonconveyance of stock is likewise a state law claim. It is not transformed into a federal claim simply because the object of the bargain was shares of stock.

*Id.* The automatic application of the language of this approach to the nexus requirement would be difficult to reconcile with the Supreme Court's holding in *Superintendent,* or with the broad language of the statute itself. But in any event, *Hunt* presents a meaningfully different set of facts than those here, since the gravamen of the claim in *Hunt* involved breach of an employment contract, whereas the gravamen of the claim here is fraudulent nonperformance of a securities transaction. Thus, the particular facts of *Hunt* are much further from the heart of section 10(b), which primarily addresses securities transactions, than are the facts at bar.

■ In *R.H. Damon & Co. v. Softkey Software Products, Inc., supra,* the District Court found that the nexus requirement was not fulfilled where a financial advisor, who was to be compensated with stock options and warrants, alleged that the company had terminated him and improperly rescinded the warrants and options. The Court reasoned that

[P]laintiffs here do not allege that the defendants misrepresented the assets, liabilities or earnings of [the company]. In the instant case, the alleged misrepresentations pertain to the conditions under which the defendants would compensate the plaintiffs for their services. As such, plaintiffs do not allege a misrepresentation as to the value of a security. Without such misrepresentations plaintiffs cannot satisfy the "in connection with" language of § 10(b) and Rule 10–b(5).

811 F.Supp. at 992. At first glance, the plaintiff's claim in that case is analogous to those presented here: Knight and Leisure nowhere contend that Leaguestar was portrayed as worth more or less than its true value; they do not argue that the share price was not paid; rather, their claim is only that Defendants misled Leisure into acting as a facilitator (through Leisure's principal, Knight) for the sale of Leaguestar by offering a compensation package to Leisure and Knight which Defendants never intended to deliver. The analogy ends there, since *Softkey,* like *Hunt,* was an employment contract case, and extending the reach of § 10(b) into every executive compensation dispute would likely be pushing it beyond the pale. In this vein, *Softkey* and *Hunt* are more like *Chemical Bank,* since the fact that the consideration offered in exchange for the other party's performance was securities, was largely fortuitous. This contrasts with the present case the essence of which is a securities transaction: the exchange of Plaintiff's 4.9% holding of Leaguestar stock for cash, a consulting position and 30,000 options to acquire Leaguestar stock. Furthermore, as noted previously, it would be incongruous indeed if a misrepresentation of the value of a security would state a § 10(b) claim, but a misrepresentation of the value of the consideration for that same security would not. The theory of the complaint is that the commission was part of the consideration for the sale of Knight's block of Leaguestar stock, and regardless of whether Plaintiffs can prove their thesis at trial, we must accept it at this procedural posture.

Accordingly, Defendants' motion to dismiss Count II, for securities fraud violations of § 10(b) of the Exchange Act and S.E.C. Rule 10b–5, Count III, for derivative controlling person liability under § 20(a) of the Exchange Act, and Count IV, for violation of Fla.Stat. § 517.301(1)(a), must be DENIED.

II. *Motion to Dismiss Count V for Common Law Fraud*

Count V sounds in common-law fraud and alleges that the misrepresentations set out above were made in order to induce Leisure to enter into a contract, *see* Complaint, Ex. A, which provided for, among other things,

Knight's sale of his shares of Leaguestar and the Knight compensation package. Significantly, Plaintiffs allege that Defendants misrepresented their willingness to perform in order to induce the consummation of the contract, *all along without the intention of ever performing.* Although it is not entitled as such, Count V is more appropriately characterized as sounding in fraudulent inducement, rather than fraud.

The "economic loss rule" pronounced by the Florida Supreme Court in *Florida Power & Light Co. v. Westinghouse Electric Corp.,* 510 So.2d 899 (Fla.1987) (contract for goods), and *AFM Corp. v. Southern Bell Tel. & Tel.,* 515 So.2d 180 (Fla.1987) (contract for services), holds that without allegations of physical injury or property damages, there can be no independent tort claiming solely economic losses flowing from a contractual breach. Although "the mere existence of a contract claim does not automatically vitiate all causes of action in tort," *Kee v. National Reserve Life Ins. Co.,* 918 F.2d 1538, 1543 (11th Cir.1990), contract principles, rather than tort principles, must be applied to resolve claims solely for economic loss consequent to a breach of contract. *See AFM,* 515 So.2d at 181. The rationale for this rule is that tort law and contract law must be held apart in order to foster the reliability of commercial transactions. Where the parties have limited liability and allocated risk by agreement, tort remedies should not be allowed to supersede the parties' prior understanding of the consequences of deficient performance. Contractual duties are imposed by agreement between the parties; the scope of those duties, and of liability for their breach, are limited by the agreement. Tort duties are imposed by society, are not limited by the understanding of the parties, and their breach may result in far more extensive remedies.

It is clear that Florida law bars all claims for fraud where the plaintiff has a remedy in contract for the breach. *See Interstate Securities Corp. v. Hayes Corp.,* 920 F.2d 769, 776–777 (11th Cir.1991). Where a contract exists, and the plaintiff asserts a claim for fraud in the breach, this is essentially the equivalent of a claim that the breach was willful. A claim for willful breach of contract is still a claim for breach of contract, and does not give rise to tort remedies, e.g., punitive damages, no matter how oppressive the breach. *See Waltman v. Prime Motor Inns, Inc.,* 446 So.2d 185 (Fla. 3d DCA 1984), *approved in part, quashed in part on other grounds by Prime Motor Inns, Inc. v. Waltman,* 480 So.2d 88 (Fla.1985). Ultimate proof of a claim for fraudulent inducement to contract, however, involves elements entirely distinct from a showing that the Defendants willfully breached an agreement; at trial, Plaintiffs must demonstrate that Defendants convinced them to enter into the agreement by means of deceitful representations and that all along the contract was a ruse the obligations of which Defendants never intended to perform.

True fraudulent inducement attends conduct prior to striking the express or implied contract and alleges that one party tricked the other into contracting. *See Williams Electric Co. v. Honeywell, Inc.,* 772 F.Supp. 1225, 1238 (N.D.Fla.1991). "It is based on pre-contractual conduct which is, under the law, a recognized tort." *Id.* Where the complaint alleges fraudulent inducement, but the facts comprising the fraudulent inducement claim are closely interwoven with the those constituting the breach of contract, the economic loss rule bars the pleading of a separate tort claim. *See Serina v. Albertson's, Inc.,* 744 F.Supp. 1113, 1118 (M.D.Fla.1990); *John Brown Automation, Inc. v. Nobles,* 537 So.2d 614, 617–618 (Fla. 2d DCA 1988) (striking punitive damages for fraud where the misrepresentation was "inextricable from the events constituting a breach of contract"); *J. Batten Corp. v. Oakridge Investments 85 Ltd.,* 546 So.2d 68, 69 (Fla. 5th DCA 1989) (dismissing fraud claim in breach of contract case). No Florida case that we can find has expressly held that true fraudulent inducement does not come within the ambit of the economic loss rule. One Florida appellate court, however, deciding under the economic loss rule that a showing of fraud at a trial of a breach of contract case could not support an award of punitive damages, noted the "constant untangled thread running though all the cases"

indicating that a fraud claim is precluded where it is "associated with the *performance* of a contract" and that the economic loss rule would not bar a fraud claim if the pleadings alleged "an intent on the part of [the defendants] not to fulfill the contract when it was formed." *John Brown*, 537 So.2d at 617–618. Here, Plaintiff's fraud claim alleges, in essence, that Defendants knew all along that they were not going to provide certain elements of the compensation package to Knight, and thus fraudulently induced Leisure to perform certain acts and Knight to sell his shares.

■ The analysis presents a question of timing: does this tort claim that Defendants fraudulently induced Plaintiffs to contract for the sale of the Leaguestar shares, arise from conduct prior to, and distinct from, the alleged willful breach of that contract? We find that Count V, for what is best described as fraudulent inducement, does arguably assail conduct prior to any alleged agreement between the parties. As such, it is distinct from the conduct constituting the breach, and does not fall within the scope of the economic loss rule. *Accord Kingston Square Tenants v. Tuskegee Gardens*, 792 F.Supp. 1566, 1576 (S.D.Fla.1992); *Williams Electric Co.*, 772 F.Supp. at 1238. Accordingly, the motion to dismiss Count V must be DENIED.

### III. Count VII—Florida Civil Theft, Fla. Stat. §§ 812.014 and 772.11

■ Plaintiffs sue in Count VII for a violation of the Florida Civil Theft statute, which provides for trebling damages when conversion has been proven. In Florida, "damages for civil theft can only be trebled where there is no contractual relationship between the parties." *See Rosenthal Toyota, Inc. v. Thorpe*, 824 F.2d 897, 902 (11th Cir. 1987) (citing *Rosen v. Marlin*, 486 So.2d 623, 624 (Fla. 3d DCA), *rev. denied*, 494 So.2d 1151 (Fla.1986)). Because there is a contractual relationship between the parties at bar, and because that relationship plainly encompasses the alleged conversion, Count VII must be dismissed.

Plaintiffs argue that the *Rosenthal/Rosen* contractual relationship exception from liability for treble damages is inapplicable here.

In *Rosenthal Toyota*, the Court of Appeals for the Eleventh Circuit reasoned that, as a matter of course, "parties in privity of contract [with the plaintiff], are not be liable for trebled damages." *Rosenthal Toyota*, 824 F.2d at 903. Plaintiffs focus on the "privity of contract" phrase from *Rosenthal Toyota*, to the exclusion of the "contractual relationship" language, and urge that the exception does not apply here since Knight was "not in *direct* privity with Defendant CUC" and because individual Defendants Shelton and Bell "are not parties to the contract." Response Memorandum at 20 n. 10 (emphasis added).

We observe first, that although Plaintiff Knight was not a signatory to the contract at issue, *see* Complaint, Ex. A, Plaintiffs concede that Knight was a third-party beneficiary to the contract. *See* Response Memorandum at 20 n. 10. As such, Knight would have a contractual relationship with the Defendant CUC, and a vested right to sue upon that contract. If Plaintiffs seek to avail themselves of the remedies provided by a purported contract, they cannot simultaneously disavow the limitations of that relationship. Second, the idea that this contractual relationship exception can be circumvented simply by naming the individual corporate officers who acted on behalf of the corporation is not supported by any caselaw, and if accepted, would eviscerate the rule.

■ Plaintiffs also argue that the contractual relationship exception is inapplicable since the civil theft claim is "*separate and distinct* from any claims that Plaintiff Knight has as a third-party beneficiary of the agreement between CUC and Leisure," citing *Nova Flight Center, Inc. v. Viega*, 554 So.2d 626 (5th DCA 1989) and *Russo v. Heil Construction, Inc.*, 549 So.2d 676 (5th DCA 1989). *See* Response Memorandum at 23, 21. Those cases, however, stand for the proposition that the contractual relationship exception is to be applied in light of a commonsense appreciation of the particular facts at hand. Where the contract between the parties is entirely irrelevant to the facts surrounding the alleged conversion, or where the contract is merely incidental to the conversion, the contractual relationship between the parties will not except the defendant

from potential liability for treble damages. For example, where a contractor stole doors which had been installed in a buyer's house, the mere fact that a contract existed between the parties for building the house would not permit the contractor to escape treble damages liability. *See Russo, supra.* Similarly, where a prior lease between the parties enabled the defendant to gain access to the plaintiff's property in order to steal electricity, avionics and engine parts, the contract was "merely incidental" and would not support the defendant's resort to the contractual relationship exception. *See Nova Flight Center,* 554 So.2d at 627. Here, in stark contrast, Plaintiffs allege the conversion of funds to be exactly coextensive with the nonperformance of an agreement between the parties. As such, the claim in Count VII for civil theft under Florida law is spurious and must be DISMISSED. Likewise, Count VIII for conspiracy to commit civil theft must also be DISMISSED.

IV. *Motion to Dismiss Claims for Common–Law and Securities Fraud for Failure to Plead with Particularity*

 We are not persuaded by Defendants' argument that the allegations of fraud fail to comport with the requirements of Fed. R.Civ.P. 9(b) because they fail to allege fraud with the requisite degree of particularity. Nor are we convinced that Rule 9(b) bars Plaintiffs from pleading allegations based on "information or belief," where the subject matter is "peculiarly within the adverse party's knowledge," *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972), the allegations are accompanied by a statement of facts upon which the belief is grounded, and the charges otherwise comport with Fed.R.Civ.P. 11. *See In re Union Carbide Corp. Consumer Products Business Securities Litigation,* 666 F.Supp. 547, 559 (S.D.N.Y.1987); *Shapiro v. Miami Oil Producers, Inc.,* 84 F.R.D. 234, 237 (D.Mass.1979). Rule 9(b) requires that "the circumstances constituting fraud ... shall be stated with particularity," Fed. R.Civ.P. 9(b), and is to be read together with Rule 8. *See Fink v. Nat. Savings & Trust Co.,* 772 F.2d 951, 959 (D.C.Cir.1985). A plaintiff must allege fraud with sufficient particularity to permit "the person charged with

fraud ... [to] have a reasonable opportunity to answer the complaint and adequate information to frame a response." *In re U.S. Oil and Gas Litigation,* 1988 WL 28544, at *2, 1988 U.S. Dist. Lexis 2217 at 4 (S.D.Fla. 1988). The allegations must be accompanied by "some delineation of the underlying acts and transactions which are asserted to constitute fraud." *Merrill Lynch, etc. v. Del Valle,* 528 F.Supp. 147, 149 (S.D.Fla.1981). The complaint must describe specific acts and omissions which, if true, might well be found after a trial to constitute fraudulent conduct on the part of the defendants. *See Felton v. Walston & Co.,* 508 F.2d 577, 582 (2d Cir.1974). In a securities fraud case, Rule 9(b) requires the identification of the particular defendants with whom the plaintiffs dealt directly, the occasions on which the misrepresentations were made, the specifics of the misrepresentations and how they are considered false, and the particular defendants who made the statements. *See Seattle First Nat. Bank v. Carlstedt,* 800 F.2d 1008, 1011 (10th Cir.1986).

 Plaintiffs have made more than conclusory allegations here. The Complaint alleges that Shelton, orally and in writing, misrepresented the compensation and other benefits that Knight would receive, Complaint at ¶ 44; that defendants Shelton and Bell, together with CUC Chairman Walter A. Forbes, drafted and reviewed a "Note for Shareholders" which indicated that Knight would be receiving a commission from the sale of Leaguestar, Complaint at ¶ 45; that certain meetings were held on specific dates at which the negotiation of the deal took place, Complaint at ¶¶ 19–21; and that the misrepresentations are reflected in two documents (the agreement letter attached to the complaint, and the "Note for Shareholders"). These allegations describe the perpetrators of the fraud, their particular roles, the particular misrepresentations, the nature of the misrepresentation, the times they were made, the documents which contain them, and the way in which Plaintiffs were allegedly misled. Accordingly, we find these allegations particular enough to put the defendants and the Court on notice of the circumstances constituting the fraud to accord with the

demands of Rule 9(b), and therefore the motion to dismiss for failure to plead with particularity must be DENIED.

### V. Motion to Dismiss Count VI—Conspiracy to Commit Common Law Fraud

Count VI names all three defendants—CUC, its President and Chief Executive Officer Shelton, and its Executive Vice President, Chief Financial Officer and Treasurer Bell—in a conspiracy to commit common law fraud. It is axiomatic, however, that a corporation cannot conspire with its agents or employees. *See Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952). Plaintiffs first argue that there is an exception to this rule where the corporate agent is alleged to have a personal stake in the activities that are separable and distinct from the corporation's interest, citing *Hackett v. Metro. General Hosp.*, 422 So.2d 986, 988 (Fla.2d DCA 1982). They argue that they have fulfilled the pleading requirements of the exception by the allegation that "[i]t was part of this conspiracy to enrich Defendant CUC and upon information and belief, the individual defendants by effectuating the acquisition without paying the full compensation as promised." Complaint at ¶ 76. Assuming *arguendo* that such an exception exists, the conclusory and unadorned accusation that the scheme would have benefitted the individuals as well as the corporation, is clearly insufficient to put the Defendants on notice as to how the actions of Shelton and Bell were at odds with rather than on behalf of, the corporation, to the point where the individuals' interests can be said to be separable and distinct from the corporation's.

Plaintiffs next argue that the complaint alleges that two other individuals, Antonio Sorrentino and Craig Nash, who were not agents of CUC, were part of the conspiracy, and therefore, a conspiracy is properly pled. *See* Complaint at ¶ 75; Response Memorandum at 26. Thus, the question remains as to whether a conspiracy involving individuals not named as defendants has been pled with the requisite particularity.

Where multiple parties are charged with fraud, the complaint must distinguish among defendants and specify their respective roles in the fraud. *See First American Bank and Trust v. Frogel*, 726 F.Supp. 1292, 1295 (S.D.Fla.1989). The allegations must alert defendants to the precise misconduct with which they are charged. *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). In contrast to the specifics detailed in the complaint as to the claims for federal and common-law fraud discussed above, which do comport with Rule 9(b), paragraph 75 of the complaint does not allege fraud with enough particularity to withstand the motion to dismiss on 9(b) grounds. That paragraph alleges only that

Upon information and belief, at some later date, SORRENTINO and NASH, and, perhaps, others, who are not named as defendants herein, but whom Plaintiff reserves the right to name as defendants after conducting discovery and satisfying Rule 11 investigation and diligence, joined the existing conspiracy to defraud, by knowingly entering into one or more agreements with Defendants and perhaps, others to defraud Plaintiffs into providing services, facilitating the acquisition, and into surrendering Plaintiff KNIGHT's Leaguestar stock.

Complaint at ¶ 75. These allegations in no way indicate what roles, if any, Sorrentino and Nash played so that CUC could fairly defend against the charge of conspiracy. No particular illicit activity by Sorrentino or Nash is pointed to. Indeed, the charge is so broad as to require CUC to defend against a conspiracy with "perhaps, others" who may be named later. "'It is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically.'" *Segal*, 467 F.2d at 607 (quoting 1A W. Barron & A. Holtzoff, Federal Practice and Procedure § 302, at 215–16 (Wright rev. 1960)). By even the most generous reading urged by Plaintiffs, Count VI for conspiracy count does not state "the circumstances constituting fraud ... with particularity" as re-

quired by Rule 9(b), and accordingly, it must be DISMISSED.

Should Plaintiffs unearth, through the course of discovery, particular grounds for alleging a conspiracy, they may seek leave from the Court to amend the complaint and/or to add additional defendants, at which time the merits of the amendment will be passed upon in accordance with the dictates of Rule 9(b).

VI. *Motion to Stay*

■ Finally, because Plaintiffs have sufficiently pled federal claims and thereby appropriately invoked the jurisdiction of the federal courts, we can discern no proper basis to stay further proceedings in this action pending resolution of the lawsuit filed by CUC for rescission in Dade County Circuit Court. Current judicially created abstention doctrine—which permits abstention only in "exceptional circumstances"—provides an insufficient basis to justify a stay in the instant scenario. The Supreme Court's pronouncements in the area suggest that the efficiency and preclusion problems created by duplicative litigation are inadequate reasons, without more, for abstaining.

■ In *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and *Moses H. Cone Memorial Hospital v. Mercury Const. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Supreme Court declared that abstention out of deference to duplicative concurrent state proceedings is appropriate only in very limited and exceptional circumstances. As a general rule, federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them" by Congress, and only where there exist "exceptional circumstances, the clearest of justifications," can the "surrender" of that jurisdiction be justified. *Colorado River,* 424 U.S. at 811, 96 S.Ct. at 1243; *see also Moses H. Cone,* 460 U.S. at 28, 103 S.Ct. at 943.

■ *Colorado River* identified four factors to be considered when determining whether the "the interests of wise judicial administration and the comprehensive disposition of the litigation outweigh the duty to exercise jurisdiction." *Moses H. Cone* added a fifth and indicated that this was not a checklist, but a recipe of items to be balanced:

(1) problems when federal and state courts assume jurisdiction over the same *res;*

(2) relative inconvenience of the federal forum;

(3) the need to avoid piecemeal litigation;

(4) the order in which the federal and state proceedings were filed;

(5) the presence of a federal question.

The Supreme Court has clearly advised that the presence of a federal question, especially when jurisdiction to enforce the federal law is not concurrent, "must always be a major consideration weighing against surrender." *Moses H. Cone,* 460 U.S. at 26, 103 S.Ct. at 942. Here, because we have found a federal question to have been properly pled, that consideration is paramount. Additionally, there has been no showing that the federal forum would be at all inconvenient. Accordingly, we decline the invitation to surrender jurisdiction and abstain.

In sum, it is hereby

ORDERED AND ADJUDGED as follows:

(1) the Motion to Dismiss (D.E. 19) is DENIED as to Count II, Count III, Count IV, and Count V (to the extent that Count V is construed as a claim for fraudulent inducement to contract);

(2) the Motion to Dismiss (D.E. 19) is GRANTED as to Count VI, Count VII, and Count VIII; and

(3) the Motion to Stay (D.E. 19) is DENIED.

Further, the parties are directed to appear before the undersigned on Wednesday September 8th, 1993 at 9:00 A.M. for a status conference.

DONE AND ORDERED.